CORWIN CHRYSLER–PLYMOUTH,
INC., a corporation, Plaintiff, Ap-
pellee, and Cross-Appellant,

v.

WESTCHESTER FIRE INSURANCE
COMPANY, a corporation, Defendant,
Appellant, and Cross-Appellee.

Civ. No. 9539.

Supreme Court of North Dakota.

May 22, 1979.

Wickham Corwin, of Conmy, Feste & Bossart, Fargo, for plaintiff, appellee, and cross-appellant.

John E. Rowell, of Nilles, Hansen, Selbo, Magill & Davies, Fargo, for defendant, appellant, and cross-appellee.

VANDE WALLE, Justice.

Westchester Fire Insurance Company ("Westchester") issued an insurance policy to Corwin Chrysler-Plymouth, Inc. ("Corwin"), insuring against employee defalcations. After one of Corwin's employees embezzled cash funds from it, Corwin sought reimbursement for the embezzlement from Westchester by filing a claim in accordance with the terms of the insurance policy. Westchester paid part of the claim to Corwin, but denied that the insurance policy covered the remaining loss. Corwin then sued Westchester in the district court to recover its full loss. The district court ordered Westchester to pay Corwin the remaining embezzlement loss, and, because it found that Westchester acted in bad faith ·in refusing to pay the remaining amount, ordered Westchester to pay compensatory damages to Corwin. Westchester appeals the district court's judgment to this court. Corwin cross-appeals the district court's judgment, arguing that it should have been awarded not only compensatory damages but also exemplary damages. We affirm.

Between April 16, 1971, and April 16, 1974, Westchester insured Corwin against, among other things:

"I. Loss of Money, Securities and other property which the Insured shall sustain through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others, . . . "

After April 16, 1974, the expiration date of Westchester's fidelity coverage, Corwin was insured under a policy issued by the General Insurance Company of America ("SAFECO").

In October, 1974, one of Corwin's employees confessed to having embezzled over $19,000. Corwin presented to Westchester a claim for, and a formal proof of loss of, $19,739.60, the loss from the embezzlement, based on auditing reports and the employee's confession. The proof of loss submitted

by Corwin included a schedule prepared by John Renner, a certified public accountant, indicating that the employee had embezzled $4,589.04 after the expiration of the insurance policy issued by Westchester. In February, 1975, Westchester paid $14,650.56 to Corwin in an attempt to satisfy the claim. This amount was calculated in the following manner:

Total amount of embezzlements ........ $19,739.60

Amount of final two entries on Renner analysis (according to John Renner's schedule, the amount embezzled after the expiration of Westchester's policy) ................... $4,589.04

Amount of deductible under policy .................. 500.00

Amount paid to Corwin .............. $14,650.56

Corwin accepted this amount but reserved its right to collect the balance of its claim from Westchester.

In May, 1975, the embezzling employee stated, in an expanded written confession, that she embezzled approximately $19,000 during four months in 1973. She also explained that, contrary to John Renner's assumption in his preparation of the schedule attached to Corwin's proof of loss, she had not limited her embezzlement to the proceeds from new and used cars. Finally, she stated that she took, at most, only $500 from Corwin in the period following the expiration of the policy issued by Westchester.

After John Renner saw the employee's expanded confession, he attempted to clarify and revise his initial analysis of the situation in a letter to Corwin, which provided, in pertinent part:

"In our review, we limited our work to the area of new and used car sales, as it was in that account receivable control account that the manipulated accounts were lodged. Accordingly, it would be possible that other accounts were manipulated at an earlier date and then ultimately lodged in the vehicle accounts after April 1, 1974. However, to analyze the individual accounts, other than the vehicle accounts, so as to determine exactly which accounts were involved in the lapping process, and the period involved, would be a very time consuming and impractical task. Regardless of the specific accounts involved in the embezzlement, and *without regard to the time that the money involved was actually taken,* it would appear that our letter of November 19, 1974, sets forth, as close as possible, the total loss incurred by your company." [Emphasis in original.]

Westchester received a copy of John Renner's letter, but, relying on Renner's first analysis, continued to refuse to pay the balance of Corwin's claim. Westchester never contacted Renner to obtain an explanation of his revised analysis, and the claims manager representing Westchester rejected an invitation to meet with him in person.

Frustrated because of its inability to collect its full claim under the insurance policy, Corwin then sued Westchester in the district court. In its complaint, Corwin asked for a declaratory judgment on the issue of the coverage and for compensatory and punitive damages. Westchester answered by denying further liability under the policy. Westchester also commenced a third-party action against SAFECO, alleging that the loss representing the unpaid balance of Corwin's claim occurred during the period covered by SAFECO's policy. The third-party action against SAFECO was subsequently dismissed with prejudice by stipulation of the parties. By this stipulation, SAFECO agreed to pay to Corwin $500, which was to be set off against any amount recovered by Corwin from Westchester.

After discovery, the district court conducted a trial of this matter. The employee, testifying on behalf of Corwin, described the manner in which she embezzled the money. Most important in this regard was her testimony that after the fall of 1973, although sometimes taking small amounts to make the accounts balance, she never took large sums. She admitted, however, that until she confessed, in October, 1974, she continued to manipulate the books to hide her initial embezzlements. She did

this by "lapping"—as money was paid in on new accounts, she debited new accounts receivable and credited this money to the old accounts that she created when she initially embezzled the money. Next, testifying in Corwin's behalf, John Renner explained the manner in which he determined the amount embezzled and the reasons for his submission of the second letter to clarify his initial analysis. Finally, Charles Corwin, an official of Corwin Chrysler-Plymouth, Inc., testified about the frustration experienced and the costs incurred by Corwin in its attempt to recover its claim from Westchester under the policy. He also stated that after Westchester paid the initial amount to Corwin under the policy, it never asked for further substantiation or proof of Corwin's claim.

On behalf of Westchester, William Wyatt, the claims manager representing Westchester, testified that there were two defects in Corwin's claim: first, that Corwin never established that the money representing the unpaid balance of its claim was embezzled during the period of Westchester's coverage rather than SAFECO's coverage; and, second, that the loss to Corwin actually occurred after Westchester's coverage ended because the employee continued to conceal her embezzlement through the "lapping" process after April 16, 1974—the expiration date of Corwin's policy with Westchester. With regard to the second argument, Westchester argued that Corwin's loss under the policy occurred not when the employee first removed money from Corwin's possession, but when she transferred money received by Corwin from new accounts to accounts that she created to hide her initial embezzlements.

The district court concluded that Westchester was liable under the policy for the balance of Corwin's claim, that Corwin was entitled to compensatory damages because Westchester acted in bad faith in denying its coverage,[1] and that Corwin was not entitled to exemplary damages because Westchester had not acted with "fraud, oppression or malice."

Westchester raises two issues on appeal:

"1. Whether, for the purpose of construing the terms of a fidelity loss policy, a loss occurs when a dishonest employee either takes funds or misapplies funds to conceal an earlier taking?"

"2. Whether the trial court's finding that Westchester by its refusal to pay Corwin's claim for the disputed amount breached its obligation to deal with Corwin in good faith was clearly erroneous?"

Corwin raises one issue on cross-appeal:

"Did the trial court err in its finding that the conduct of Westchester towards its insured was not malicious or oppressive, therefore rendering an award of punitive damages inappropriate?"

I

Westchester argues that the district court erred in concluding that, under the terms of the insurance policy, Corwin suffered its loss when the employee removed the embezzled money from Corwin's possession. Citing *Couch on Insurance* 2d, § 46:185 at 236–237 (1965), and cases cited therein, it argues that amounts embezzled after April 16, 1974, the expiration date of its coverage, to conceal amounts embezzled prior to that date, are not covered under its policy. It appears to argue, in essence, that the time at which funds diverted from proper accounts through "lapping" is the time when the loss occurs under the policy. A necessary corollary to this argument is that the money taken to conceal the initial embezzlements, and transferred to the accounts from which the funds were first embezzled, somehow reimburses the insured for that initial embezzlement loss. Westchester concedes, however, that in *Couch on Insurance* 2d, § 46:184 at 236 (1965), the author states that although the rule upon which Westchester relies is supported by "some authority," the majority rule is "that

1. The district court concluded that Corwin was entitled to $9,786.72 as damages. Of this amount, $5,887.35 represented compensatory damages including attorney fees and reim-

bursement for time spent by Corwin's employees in attempting to resolve this controversy. Westchester challenges neither the amount nor composition of the compensatory damages.

a default occurs when the initial misconduct is committed, and not at subsequent times when the employee takes steps to cover up his initial misconduct, . . . " [Footnote omitted.] Westchester urges us not to adopt this majority rule. We reject Westchester's position.

■ The policy at issue does not define the time at which the "loss" through employee embezzlement occurs. Quite clearly, then, an ambiguity as to this term exists. William Wyatt, the claims manager representing Westchester, conceded the existence of the ambiguity during cross-examination at his deposition:

"Q. And then going on with regard to the term loss, when the policy speaks of a loss with regard to employee dishonesty coverage, when they use the word 'loss,' they're talking about the actual taking of the money from the premises of the insured by the employee, rather than the subsequent manipulations of the insured's books; is that correct?

"A. I don't think I would agree with that. I think that's the crux of this question.

"Q. I'm confused. Then when does the loss occur? Let's assume that the money was taken—

"A. If we had a good, clear answer to the question, we wouldn't have any problems with this loss."

At trial, Mr. Wyatt again conceded the existence of the ambiguity:

"Q. And you are denying payment of that amount, again, because of your own inability to resolve to your own satisfaction these questions that you see, the legal question of whether or not the loss occurs when the money is taken or the books were manipulated. You, apparently, have resolved that question in your own mind in determining when the books have been manipulated?

"A. That question hasn't been resolved. I don't think we have resolved it for our benefit."

2. Were the parties to this appeal two insurance companies, rather than an insured and its in-

This court said in *Wall v. Pennsylvania Life Insurance Company*, 274 N.W.2d 208, 215 (N.D.1979):

"As we stated in *Hughes v. State Farm Mutual Automobile Insurance Company*, 236 N.W.2d 870, 885 (N.D.1975), insurance policies drawn by the company are adhesion contracts and any ambiguity must be construed most strongly against the company. *Williams v. Niesen*, 261 N.W.2d 401, 403-404 (N.D.1977); *Mills v. Agrichemical Aviation, Inc.*, 250 N.W.2d 663, 670-671 (N.D.1977). If one interpretation of the policy language will impose liability on the insurer and the other will not, the interpretation favorable to the insured will be adopted. *Williams v. Niesen, supra* 261 N.W.2d at 404; *Mills v. Agrichemical Aviation, Inc.*, supra 250 N.W.2d at 670. Finally, 'an insurance policy is held to mean what a reasonable person in the position of the insured would think it meant.' *Haugen v. Auto-Owners Insurance Co. of Lansing*, 191 N.W.2d 274 (Syllabus 4) (N.D.1971)."

In the case at bar, the language of the policy could arguably be construed to support either party's position as to when the loss occurred. Therefore, applying the rules of interpretation cited in *Wall*, we conclude that the district court acted properly in construing the policy in a manner that imposed liability on Westchester, the insurer.

In reaching this portion of our decision, because we have found an ambiguity in the policy we need not consider the cases cited by either party to buttress their arguments. We therefore limit this decision to its facts.[2]

## II

Westchester argues that the district court erred in finding that it acted in bad faith in denying its liability for the unpaid balance of Corwin's claim. Our research has revealed no North Dakota cases directly in point. We therefore turn to cases from other jurisdictions for guidance.

surance company, Westchester's argument might be more persuasive.

In *Gruenberg v. Aetna Insurance Company*, 9 Cal.3d 566, 573–574, 108 Cal.Rptr. 480, 485, 510 P.2d 1032, 1037 (1973), the Supreme Court of California enunciated an insurer's duty to act in good faith in dealing with its insured concerning a claim under an insurance policy:

". . . in the case before us we consider the duty of an insurer to act in good faith and fairly in handling the claim of an insured, namely a duty not to withhold unreasonably payments due under a policy. . . . That responsibility is not the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation, deemed to be imposed by the law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in so doing, it fails to deal *fairly and in good faith* with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing." [Emphasis in original.]

For different expressions of the same principle, see, e. g., *Anderson v. Continental Insurance Company*, 85 Wis.2d 675, 271 N.W.2d 368 (1978); *Christian v. American Home Assurance Company*, 577 P.2d 899 (Okl.1978); *United States Fidelity & Guaranty Company v. Peterson*, 91 Nev. 617, 540 P.2d 1070 (1975); Annot., 47 A.L.R.3d 314 (1973).

The court in *Mustachio v. Ohio Farmers Insurance Company*, 44 Cal.App.3d 358, 363–364, 118 Cal.Rptr. 581, 584 (1975), described the consequences of an insurer's breach of duty to act in good faith:

" '[W]hen the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort.' (*Gruenberg v. Aetna Ins. Co., supra*, 9 Cal.3d 566, 575, 108 Cal.Rptr. 480, 486, 510 P.2d 1032, 1038.) Moreover, 'such conduct on the part of a[n] . . . insurer constitutes a tortious interference with a protected property interest of its insured for which damages may be recov-

ered to compensate *for all detriment proximately resulting therefrom*, including economic loss as well as emotional distress resulting from the conduct or from the economic losses caused by the conduct, and, in a proper case, punitive damages.' (*Fletcher v. Western National Life Ins. Co.*, 10 Cal.App.3d 376, 401–402, 89 Cal.Rptr. 78, discussed with approval in *Gruenberg, supra*, 9 Cal.3d at pp. 574–575, 108 Cal.Rptr. 480, 510 P.2d 1032; italics added.)

"It follows as a matter of course that if the insurer's tortious conduct makes it reasonable for the insured to seek the protection of counsel, the insurer is responsible for that item of damages. . .

"If the insurer, instead of bargaining with the insured in good faith, tortiously violates its covenant of good faith and fair dealing and thereby makes it reasonable for the insured to seek the protection of counsel, plain justice demands that the insurer be financially responsible for an expense which but for its tortious conduct would not have been incurred." [Emphasis in original; footnote omitted.]

*But see Twentieth Century-Fox Film Corp. v. Harbor Ins. Co.*, 85 Cal.App.3d 105, 149 Cal.Rptr. 313 (1978).

■ We hold that in North Dakota an insurer is obligated to act in good faith in its relationship with its policyholders. An insurer's breach of this duty may subject it to liability for damages to the insured proximately caused thereby. Cf. *Bekken v. Equitable Life Assur. Soc.*, 70 N.D. 122, 293 N.W. 200 (1940), wherein this court held that an insurance company is under a legal duty to take prompt action on an application for an insurance policy.

■ The district court, applying principles essentially the same as those set forth in *Gruenberg* and *Mustachio*, found that Westchester acted in bad faith by refusing to pay to Corwin the balance of its claim, and therefore ordered compensatory damages to Corwin. Whether an insurer has acted in bad faith in refusing to pay amounts claimed under an insurance policy

is a question for the trier of fact. See, e. g., *Bekken v. Equitable Life Assur. Soc., supra; Rector v. Husted,* 214 Kan. 230, 519 P.2d 634 (1974); *Bailey v. Universal Underwriters Insurance Co.,* 258 Or. 201, 474 P.2d 746 (1970). Thus we must affirm the district court's finding of bad faith unless we conclude, after viewing the evidence presented at trial, that such a finding was "clearly erroneous." Rule 52(a), N.D.R.Civ.P.

■ Of the evidence propounded at trial, we deem the following most significant to the issue of bad faith: Citing John Renner's initial analysis of the embezzlement, Westchester paid to Corwin part of its claim, but refused to pay the full amount. Yet, after John Renner issued a second letter—in which he clarified his first analysis by stating that it summarized the loss "without regard to the time the money involved was actually taken"—Westchester persisted in its refusal to pay the balance of Corwin's claim. It continued to deny its liability for the balance even though the employee who embezzled the money—the only person who could shed light on the question of when the money was taken—stated that she embezzled all but, at most, $500 of the money during the period of Westchester's coverage. At that point, Westchester developed its "lapping" defense, which we have discussed previously. Westchester argues that it relied on this defense in good faith. At no time after its payment of part of Corwin's claim, however, did Westchester request that Corwin provide additional evidence to substantiate the remainder of its claim. Moreover, it appears that until this litigation began, Westchester never informed Corwin of its legal position as to the "lapping" question.

In view of this evidence, we cannot state that the court's finding of bad faith was "clearly erroneous." Westchester had no valid ground to continue to deny liability after the employee explained in her expanded confession that she took all but, at most, $500 of the money during the period of Westchester's coverage, and after John Renner clarified his first analysis.

As to Westchester's legal defense, the insurance policy at issue does not define the time at which the insured suffers a loss through employee embezzlement. Thus, because two interpretations, both reasonable, of the policy exist, the policy contains an ambiguity. In North Dakota, as we have stated previously, when an insurance policy will support one interpretation that imposes liability and one that does not, the former interpretation will be adopted. Westchester is held to know the law of North Dakota and therefore should have known that in light of the ambiguous policy language, if litigation ensued, it undoubtedly would be found liable for the balance of Corwin's claim.

In any event, had Westchester actually been relying on this defense from the beginning, it would have denied any liability under the policy because the embezzling employee testified that she continued "lapping" long after Westchester's coverage had expired. Westchester, however, paid part of Corwin's claim. This payment is inconsistent with its subsequent reliance upon the legal defense described above. Finally, prior to the commencement of this litigation, Westchester never informed Corwin that, in order to establish its liability under the policy, Corwin must provide evidence of when the "lapping" occurred. Each of these factors indicates that the legal defense upon which Westchester relies to establish its good faith was an afterthought conceived when Westchester realized that litigation was imminent.

We hasten to add that this is not a case in which an insurer, from the outset of the claim controversy, has relied in good faith on an arguable legal defense. Westchester's legal defense was formulated only in the late stages of this dispute, and, although possibly successful in a lawsuit in which both parties were insurers, was unreasonable here because, apart from its merit, policy language conceded even by Westchester to be ambiguous foreclosed any possibility that it would prevail if litigation ensued. In reaching this result, we echo the words of the Supreme Court of Oklahoma in *Christian v. American Home Assurance Company, supra,* 577 P.2d at 904–905:

"We approve and adopt the rule that an insurer has an implied duty to deal fairly and act in good faith with its insured and that the violation of this duty gives rise to an action in tort for which consequential and, in a proper case, punitive, damages may be sought. We do not hold that an insurer who resists and litigates a claim made by its insured does so at its peril that if it loses the suit or suffers a judgment against it for a larger amount than it had offered in payment, it will be held to have breached its duty to act fairly and in good faith and thus will be liable in tort."

### III

As mentioned above, the district court awarded compensatory damages, but declined to award exemplary damages to Corwin. Corwin, on cross-appeal, argues that the district court erred in refusing to award exemplary damages because, according to Corwin, Westchester's conduct evinced, in addition to bad faith, malice or oppression. We do not agree.

■ Our review of an appeal from a district court's ruling on punitive damages is limited to a determination of whether the district court "abused its discretion and thereby effected an injustice." See, e. g., *Eakman v. Robb*, 237 N.W.2d 423 (N.D. 1975), Syllabus ¶ 6.

Section 32–03–07, N.D.C.C., provides:

"In any action for the breach of an obligation not arising from contract, when the defendant has been guilty of oppression, fraud, or malice, actual or presumed, the court or jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant."

■■ Here, the underlying controversy arises from an insurance contract. "Generally, damages for breach of contract are limited to the pecuniary loss sustained. Exemplary damages are not recoverable in an action for breach of contract unless the breach amounts to an independent, willful tort, in which event exemplary damages

may be recovered under proper allegations of malice, wantonness, or oppression." *Vallejo v. Jamestown College*, 244 N.W.2d 753, 758 (N.D.1976). The insurer's duty to act in good faith, however, emanates not from the terms of the insurance contract but from an obligation "imposed by the law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities." *Gruenberg v. Aetna Insurance Company, supra*. Thus, in a proper case, an insurance company found to have acted in bad faith could be required to pay punitive damages to its insured.

Yet a finding of bad faith alone does not entitle the insured to punitive damages; oppression, fraud, or malice, actual or implied, must also be found. In *Silberg v. California Life Insurance Company*, 11 Cal.3d 452, 113 Cal.Rptr. 711, 521 P.2d 1103 (1974), finding that an insurer acted in bad faith in denying liability under an insurance policy, a jury awarded both compensatory and exemplary damages to the insured. The trial court subsequently granted the insurer's motion for a new trial on the grounds of insufficient evidence to support the verdict, errors in law, and excessive damages. On appeal, the Supreme Court of California reversed that part of the trial court's order granting a new trial because of insufficient evidence to support the insurer's liability for compensatory damages and because of excessive compensatory damages. Addressing that part of the trial court's order granting a new trial because of excessive exemplary damages, however, the court stated:

"It does not follow that because plaintiff is entitled to compensatory damages that he is also entitled to exemplary damages. In order to justify an award of exemplary damages, the defendant must be guilty of oppression, fraud or malice. (Civ.Code, § 3294.) He must act with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights. (*Wolfsen v. Hathaway* (1948) 32 Cal.2d 632, 647 et seq., 198 P.2d 1 (overruled on another ground in *Flores v. Arroyo* (1961) 56 Cal.2d 492, 497, 15 Cal. Rptr. 87, 364 P.2d 263); *Roth v. Shell Oil*

*Co.* (1960) 185 Cal.App.2d 676, 682, 8 Cal. Rptr. 514.) While we have concluded that defendant violated its duty of good faith and fair dealing, this alone does not necessarily establish that defendant acted with the requisite intent to injure plaintiff.

" . . . The trial court's conclusion that defendant was not guilty of oppressive conduct did not constitute a manifest and unmistakable abuse of discretion. (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387, 93 Cal.Rptr. 769, 482 P.2d 681.) Therefore, the order granting a new trial must be affirmed insofar as it determines that the evidence was insufficient to justify the award of punitive damages." 11 Cal.3d at 462 463, 113 Cal. Rptr. at 718, 521 P.2d at 1110.

See also, e. g., *Anderson v. Continental Insurance Co., supra; Neal v. Farmers Insurance Exchange*, 21 Cal.3d 910, 148 Cal.Rptr. 389, 582 P.2d 980 (1978); *Austers v. National Casualty Company of Detroit, Michigan*, 84 Cal.App.3d 1, 148 Cal.Rptr. 653 (1978); *United States Fidelity & Guaranty Company v. Peterson, supra.*

■ The statute authorizing exemplary damages in California is substantially similar to that of North Dakota.[3] To recover punitive damages under California's statute, the insured must show that the insurer acted "with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights." *Silberg v. California Life Insurance Co., supra.* We similarly construe our statute.

■ In the case at bar, just as in *Silberg*, the insurer has acted in bad faith. Yet here, just as in *Silberg*, the insured has

failed to show that the insurer acted with the intent necessary to justify an award of exemplary damages. Nothing in the record indicates that Westchester has been guilty of oppression, fraud, or malice. In fact, the record belies such a conclusion. We deem it unlikely that Westchester would have paid any of the initial $19,739.60 claim presented to it by Corwin had it harbored oppressive, fraudulent, or malicious motives.

We conclude that the district court did not abuse its discretion in denying punitive damages.

## IV

■ Finally, on appeal to this court, Corwin argues that it is entitled to an award from Westchester of reasonable attorney fees incurred in its participation in this appeal.[4] It asks that we remand this case to the district court for a determination of the proper award of attorney fees.

Westchester's appeal is not frivolous. Many of the issues presented have not been considered heretofore by this court. We therefore decline to award attorney fees to Corwin.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and PEDERSON, PAULSON and SAND, JJ., concur.

---

3. Cal.Civil Code § 3294 (West), provides:
   "In an action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, express or implied, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant."

4. Rule 38, N.D.R.App.P., allows this court to award "just damages and single or double costs including reasonable attorney's fees" if we determine that the appeal is frivolous. Sec. 28-26 01(2), N.D.C.C., authorizes the court, in its discretion and upon a finding that the pleading was frivolous, to award reasonable actual or statuory costs, or both, including reasonable attorney fees to the prevailing party. The Procedure Committee Notes to Rule 38 indicate that Sec. 28-26-01 involves determinations that are to be made initially by the trial court, while Rule 38 relates to an initial determination by the Supreme Court. Sec. 28 26 01 (2) was further amended by the 46th Legislative Assembly. See Chap. 372, 1979 S.L.