Richard SEIFERT, Plaintiff
and Appellant,

v.

FARMERS UNION MUTUAL
INSURANCE COMPANY,
Defendant and Appellee.

Civ. No. 920109.

Supreme Court of North Dakota.

March 11, 1993.

Reichert, Buresh, Herauf & Ficek, PC, Dickinson, for plaintiff and appellant, argued by William A. Herauf.

Clark J. Bormann (argued), Bismarck, for defendant and appellee.

MESCHKE, Justice.

Richard Seifert appeals a summary judgment for Farmers Union Mutual Insurance

Company (FUMutual) denying his claim for heat damage to his corn crop that resulted after windstorm damage to his irrigation equipment. We affirm.

In 1983, Seifert insured his farm buildings and personal property with FUMutual for fire and storm damage. In 1984, Seifert added his irrigation equipment to the policy. That supplement expressly excluded liability for "consequential loss of any nature." On March 29, 1984, through the same agent, Seifert bought a multi-peril crop insurance policy from another company for his irrigated corn that was not covered by the policy with FUMutual.

Late on July 30, 1984, a windstorm wrecked Seifert's irrigation equipment. He discovered the damage the next morning and reported it to FUMutual. He then hired Jamestown Irrigation, Inc. (JII) to temporarily repair the equipment, because JII was unable to do complete repairs immediately.

FUMutual knew that Seifert had hired JII to temporarily repair the equipment on August 1, but FUMutual's adjuster preferred that someone completely repair the equipment in a single effort because it would normally be less expensive than two repair trips. For that purpose, FUMutual requested that Seifert get a second repair estimate. Seifert delayed JII's trip for temporary repairs while he sought another company to do them. When he was unsuccessful in getting another company, Seifert went back to JII, although the temporary repairs were delayed until August 7, 1984. The lack of water during the heat of those sweltering days stunted Seifert's corn.

On August 16, 1984, Seifert delivered a "Sworn Statement in Proof of Loss" to FUMutual for the damage to his irrigation system. At that time, Seifert made no complaint to FUMutual about his potential crop loss. On August 20, 1984, he received and endorsed a draft from FUMutual for $4,912.74 for the repair of his equipment. The face of the draft said, "This is your loss draft in full satisfaction of all claims." On the reverse was this language:

NOTICE TO PAYEES

\* \* \* \* \* \*

Endorsement of this draft constitutes a release of all claims, known or unknown, the undersigned has or may have against Farmers Union Mutual Insurance Company on account of any and all claims arising out of the claim and/or loss referred to on the face hereof.

Seifert endorsed the draft, received the proceeds, and completed full repair of his irrigation equipment.

In late fall 1984, Seifert harvested his crop and realized that it had been damaged by the lack of irrigation in early August. He filed a claim under his multi-peril crop insurance policy, but was compensated only on a non-irrigated basis because the corn had not been continuously irrigated. In mid-November 1984, Seifert orally expressed his dissatisfaction to FUMutual over its adjuster's delay of the repairs and the effect on his corn. For the next nearly six years, Seifert made no claim to FUMutual for his irrigated crop loss.

Finally, on July 25, 1990, Seifert sued FUMutual for the difference between the amount he harvested and recovered for non-irrigated corn and the amount he would have had from a continuously irrigated corn crop. Seifert sued the company's agent as well, but the agent was later dismissed by settlement. FUMutual denied liability.

Seifert alleged negligent conduct by FUMutual in seeking a second repair estimate on the equipment, delaying repairs, and causing damage to his crop. Seifert claimed that FUMutual breached an implied duty of good faith and fair dealing by seeking the second estimate without language in the insurance policy that required it. FUMutual moved for summary judgment.

The trial court granted summary judgment to FUMutual, concluding that Seifert's claims for negligence and bad faith were "without a factual basis," and that Seifert "knowingly compromised and settled any and all claims arising from the incident of July 30–31, 1984, by virtue of [his] voluntary sworn statement in proof of

loss and his acceptance of payment thereon together with his release of [FUMutual] from any and all other claims." Seifert appeals.

■ In reviewing a summary judgment, we view the evidence in the light most favorable to the opposing party, and determine whether the trial court properly granted summary judgment as a matter of law. *Ertelt v. EMCASCO Insurance Co.*, 486 N.W.2d 233 (N.D.1992). For reversal of a summary judgment under NDRCivP 56(c), Seifert must identify competent evidence that raises a genuine issue as to a material fact.

Seifert argues that summary judgment to FUMutual was "precluded due to disputed facts which when resolved in favor of [Seifert] would allow a jury to return a Plaintiff's verdict." First, he says that "[t]his is not an issue of contract but, rather, one of conduct" because FUMutual "had no authority to require a second estimate," and that the negligent "conduct of the insurance adjuster ... in interfering with [JII's] temporary set-up" injured Seifert's irrigated corn. Second, Seifert asserts that the policy exclusion of "consequential loss of any nature" does not bar his claim because FUMutual acted in bad faith in delaying repairs to his irrigation system. Finally, he claims that the payment he accepted from FUMutual "dealt with the damage to the irrigation equipment and was in no way intended to relieve any liability for the damage to the irrigated corn crop."

FUMutual responds that there are no genuine issues of fact. FUMutual argues that the "facts" that Seifert claims are disputed are actually "legal issues," and that the language of the policy, Seifert's failure to file a proof of loss with FUMutual for the crop, and the release defeat his claim as a matter of law.

### I. CONTRACT OR TORT?

■ Arguing that "[t]his is not an issue of contract but, rather, one of conduct," Seifert seeks to make this action into a tort claim, not a contract claim. He alleges both negligence and bad faith conduct by FUMutual. FUMutual counters that, in a contract action, "tortious conduct must exist independently of a breach of contract." We agree.

On the distinction between tort and contract, one scholar says:

> Tort obligations are in general obligations that are imposed by law on policy considerations to avoid some kind of loss to others. They are obligations imposed apart from and independent of promises made and therefore apart from any manifested intention of parties to a contract or other bargaining transaction. Therefore, if the alleged obligation to do or not to do something that was breached could not have existed but for a manifested intent, then contract law should be the *only* theory upon which liability would be imposed.

W. Page Keeton et al., *Prosser and Keeton on The Law of Torts* § 92, at 656 (5th ed. 1984) (emphasis original). The question in this case is whether FUMutual's obligations to Seifert "could not have existed but for a manifested intent" that requires resolution solely by contract law.

### II. NEGLIGENCE

■ Despite his reliance on a contract of insurance, Seifert alleges negligent "conduct of the insurance adjuster ... in interfering with [JII's] temporary set-up" as a proximate cause of his crop loss. Seifert essentially claims that FUMutual was contractually bound to repair his irrigation equipment in a specific manner and that FUMutual breached its contractual duty to do so. Thus, Seifert's claim is still in contract for breach, not in tort for negligence.

We considered a tort claim in conjunction with a claim for breach of contract in *Pioneer Fuels, Inc. v. Montana–Dakota Utilities*, 474 N.W.2d 706 (N.D.1991). A seller of used oil sued its customer in both contract and tort for the customer's breach of a requirements contract to purchase oil from the seller whenever the seller's price was the lowest bid. The jury found that the customer had breached the contract "with malice, fraud, deceit or oppression" and awarded the seller both contract dam-

ages and exemplary damages. *Id.* at 708. On appeal, we held that "a mere breach of contract does not, by itself, furnish a basis for liability in tort for negligence." *Id.* at 710 (citing *Madler v. McKenzie County*, 467 N.W.2d 709, 715 (N.D.1991)). Moreover, we said that "[a] breach of contract even if intentional, malicious, or in bad faith, is not enough to convert a contract action into a tort action." *Pioneer Fuels, Inc.*, 474 N.W.2d at 710 (quoting *Hay v. Dahle*, 386 N.W.2d 808, 811 (Minn.Ct.App. 1986)). Affirming the trial court's ruling that denied exemplary tort damages, we said:

> In our view, Pioneer did not show that it was damaged by MDU's breach of any duty that did not arise from the contract. Pioneer did not show that MDU committed an independent tort, separate and distinct from its breach of contract. From our review of the evidence, we conclude that MDU was entitled to a judgment in its favor on Pioneer's tort and exemplary damage claims as a matter of law because no independent tort was shown.

*Pioneer Fuels, Inc.*, 474 N.W.2d at 710. *See Alaska Pacific Assurance Co. v. Collins*, 794 P.2d 936, 946 (Alaska 1990) ("We decline to hold that where a party breaches a contractual promise 'negligently,' such conduct may form the basis for a tort action."). *See also Cooperative Power Ass'n v. Westinghouse Electric Corp.*, 493 N.W.2d 661 (N.D.1992) (distinguishing between negligence and breach of warranty). Likewise, even if FUMutual breached its insurance contract, it is entitled to judgment as a matter of law on Seifert's negligence claim because the evidence shows no independent tort.

Seifert alleges that FUMutual "had no authority to require a second estimate" for the repairs to his irrigation equipment. However, we read no clause in the policy that precludes the insurer from seeking a second estimate before agreeing to pay for repairs. Rather, FUMutual's adjuster testified that, "It's your duty as an insured to get your items fixed." When Seifert's counsel asked, "So then on the 1st of August, could [Seifert] have hired Jamestown

Irrigation to come out and repair it?," the adjuster replied, "Yes, he could,...."

Indeed, the "GENERAL CONDITIONS & PROVISIONS" of the property policy say so: "PERMISSION GRANTED: (c) for Named Insured to make alterations, additions and repairs, ..." The section continues: "In the event of loss hereunder, the Insured is permitted to make reasonable repairs, temporary or permanent, provided such repairs are confined solely to the protection of the property from further damage." Seifert could have proceeded with temporary repairs regardless of FUMutual's request for another estimate.

"Although ['courts in a growing majority of jurisdictions'] have recognized the bad-faith cause of action in first-party cases, they have declined to predicate tort liability on theories of 'negligent breach' of insurance contracts." William M. Shernoff et al., *Insurance Bad Faith Litigation* § 1.07[2] (1992). FUMutual's handling of Seifert's claim was not tortious conduct. To adopt Seifert's theory of negligence in performance of a contract would open the door to a tort remedy for every contract breach. We reject Seifert's notion of "negligent breach," and we decline to extend the tort concept of negligence to the acts or omissions of an insurer.

## III. BAD FAITH

Raising bad faith in allegedly dilatory conduct to resolve his claim, Seifert argues the absence of good faith on the part of FUMutual. "Good faith" consists "in an honest intention to abstain from taking any unconscientious advantage of another even through the forms or technicalities of law, together with an absence of all information or belief of facts which would render the transaction unconscientious." NDCC 1–01–21. The question is whether FUMutual's handling of Seifert's claim evidences "bad faith."

 North Dakota recognizes a bad faith action for breach of the implied covenant of good faith and fair dealing in an insurance policy. In *Corwin Chrysler–Plymouth, Inc. v. Westchester Fire Insur-*

ance Company, 279 N.W.2d 638 (N.D. 1979), a fidelity insurer was ordered to pay its insured the disputed portion of an embezzlement claim, and compensatory damages due to the insurer's bad faith in denying coverage. Finding no prior North Dakota cases in point, we relied upon the opinion of the Supreme Court of California on an insurer's duty to act in good faith toward its insured on a claim under an insurance policy:

> [T]he duty of an insurer to act in good faith and fairly in handling the claim of an insured, namely a duty not to withhold unreasonably payments due under a policy ... is not the requirement mandated by the terms of the policy itself—to defend, settle, or pay. It is the obligation, deemed to be imposed by the law, under which the insurer must act fairly and in good faith in discharging its contractual responsibilities. Where in so doing, it fails to deal *fairly and in good faith* with its insured by refusing, without proper cause, to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing.

Id. at 643 (quoting *Gruenberg v. Aetna Insurance Company*, 9 Cal.3d 566, 108 Cal.Rptr. 480, 485, 510 P.2d 1032, 1037 (1973) (emphasis original)); *see Smith v. American Family Mut. Ins. Co.*, 294 N.W.2d 751 (N.D.1980); *see also Alaska Pacific Assurance Co. v. Collins*, 794 P.2d at 947. As one scholar has put it:

> Under *Gruenberg* and cases following it, the test for insurer bad faith in first party situations is whether the insurer has acted unreasonably in handling an insured's claim by failing to compensate the insured, without proper cause, for a loss covered by the policy. Under the *Gruenberg* test, bad faith does not exist when an insurer denies coverage based on a reasonable interpretation of policy language. An interpretation of the policy that is *not* reasonable, however, is, a basis for bad faith liability.

William M. Shernoff et al., *Insurance Bad Faith Litigation* § 5.02[2] (1992) (emphasis original) (footnotes omitted). In *Corwin*

*Chrysler–Plymouth*, affirming the trial court's finding that the insurer breached its obligation to deal with the insured in good faith, we explained that, in our view, the fact most significant to the question of bad faith was the refusal of the insurer to pay its insured's claim, despite the insurer's knowledge that the insured had incurred a payable loss. *Id.* at 644.

In this case, too, the most important fact for Seifert's bad faith claim is FUMutual's knowledge of the circumstances surrounding his irrigation equipment damage claim, or the lack of it. FUMutual's lack of knowledge about any adverse effect from its claim adjustment process upon Seifert's irrigated crop absolves it of bad faith.

The adjuster testified:

Q. And on the 3rd of August Seifert and you talked on the telephone?

A. Right.

Q. And on that date [Seifert] told you Jamestown was going to repair it?

A. Right. He told me they were going to repair it. He also told me that they had to go down and get the parts for it.

Q. Okay. Did he tell you, This is terrible, you delayed everybody's repair here?

A. He was contented. He was that. All I know is when we—I went out to get the proof of loss signed, which would have been on the 16th, that's the date that's signed, the system wasn't running.

Q. On that date?

A. Right.

Q. You remember that?

A. I remember that, because I asked him what was the problem.

Q. And what did he say?

A. I'm out of fuel. I don't have money to buy fuel.

Q. On August 3rd when he called you to tell you that Jamestown Irrigation was going to do the repair and were going to Nebraska to get the parts, did he tell you you should never have made me call anybody else?

A. No.

Q. Did he ever tell you, Thanks to you I'm going to have a crop ruined here?

A. No.

Q. Did he ever tell you on the 3rd of August that he was dissatisfied with the repair scenario?

A. No.

Seifert admitted that he made no protest of FUMutual's repair arrangements. He testified: "Q. [D]id you have any other conversations with [FUMutual's adjuster] before they came to repair it? A. I don't believe so. No."

Rather than acting in bad faith, FUMutual maintained contact after its first meeting with Seifert. Seifert testified that he never contacted FUMutual's adjuster between the first couple of days in August and the date of repair. If the irrigated crop was in such extreme danger of stress, Seifert needed to communicate to his insurer the urgency of repair before he can complain that it knew of problems and acted in bad faith. There is no evidence of bad faith.

### IV. RELEASE

■ Seifert says that a jury should have been allowed to determine whether he intended to release FUMutual from liability for crop loss when he accepted the draft in payment for the damage to his equipment. However, the back of the FUMutual draft that Seifert accepted said that, by signing the draft, Seifert would release "all claims, known or unknown" that Seifert "has or may have against Farmers Union Mutual Insurance Company on account of any and all claims arising out of the claim and/or loss referred to on the face hereof." In his deposition, Seifert testified:

Q. Okay. When you reviewed the Farmers Union Mutual Insurance policy, you know that there isn't any coverage in that policy for the irrigation— I mean, for the crop. Correct?

A. Yes.

Q. And, in fact, that would probably be one of the reasons why you went with the [crop insurer]; correct?

A. Yes.

Q. Because you knew that the home owner's policy—farm owner's policy you had with Farmers Union Mutual did not cover the crops?

A. Yes.

The trial court ruled that

[Seifert] was knowledgeable concerning the insurance coverage provided, concerning the loss or losses sustained by [him] as a result of the occurrence of July 30–31, 1984, and that with said knowledge filed his sworn statement in proof of loss on August 16, 1984, and was fully compensated based upon said claim. Further, that in consideration of payment upon said claim, [Seifert] released [FUMutual] from any and all further claims arising from said incident.

We agree. Seifert released FUMutual not only from his equipment damage, but also from any consequential loss.

### V. CONCLUSION

The trial court concluded that Seifert knew about the consequential damage exclusion in his equipment policy, and that Seifert's claim for "lack of good faith and fair dealing in addressing claims [by Seifert] is without a factual basis." We agree. FUMutual fulfilled its contractual obligations in the insurance policy. We see no disputed issue of fact on negligence or bad faith conduct by FUMutual.

Viewing the evidence in the light most favorable to Seifert, Seifert has no claim either in contract or in tort against FUMutual. We conclude that the summary judgment was correct.

We affirm.

VANDE WALLE, C.J., LEVINE, J., and RALPH J. ERICKSTAD, Surrogate Judge, concur.

Surrogate Judge RALPH J. ERICKSTAD was Chief Justice at the time this case was heard and serves as surrogate judge for this case pursuant to NDCC 27–17–03.

Justice J. PHILIP JOHNSON, who was a member of the Court when this case was heard, did not participate in this decision.

Justice NEUMANN and Justice SANDSTROM, not being members of the Court

when this case was heard, did not participate in this decision.