AMERADA HESS CORPORATION, in its own behalf and as unit operator of the Tioga-Madison Unit, Plaintiff and Appellant,

v.

FURLONG OIL AND MINERALS COMPANY, Defendant and Appellee.

Civ. No. 10430.

Supreme Court of North Dakota.

June 24, 1983.

Fleck, Mather, Strutz & Mayer, Bismarck, for plaintiff and appellant; argued by John W. Morrison, Bismarck.

Bjella, Neff, Rathert, Wahl & Eiken, Williston, for defendant and appellee; argued by Fred C. Rathert and Vern C. Neff, Williston.

Rolfstad, Winkjer, McKennett, Kaiser, Stenehjem & Walters, Williston, amicus curiae.

PEDERSON, Justice.

Amerada Hess Corporation appeals from an order dissolving a temporary restraining order. We reverse and remand.

The K–119 Well, which is the subject of this controversy, was drilled in 1956 by Amerada Petroleum Corporation, predecessor

to Amerada Hess Corporation, pursuant to an oil and gas lease from Clifford and Alice Syverson. The well was completed in the Rival Zone of the Madison Pool and produced oil and gas until September 1969 when it was shut-in.[1] Amerada released the oil and gas lease as to the Syversons' interest in November 1974.

In November 1982, the Syversons leased their mineral interests to Furlong Oil and Mineral Company. Furlong subsequently applied for and received permission from the North Dakota Industrial Commission to reenter the well bore of the K–119 Well and recomplete the well in the Midale and Ratcliffe Zones of the Madison Formation. Furlong began preparation for reentry into the K–119 Well. Access roads were prepared and a work-over rig was secured. On April 6, 1983, the work-over rig was moved on location and reentry operations were started.

On April 6, 1983, Amerada commenced this action with a summons and complaint seeking to enjoin Furlong from entering, using, or interfering with the well bore of the K–119 Well. Amerada alleged that the Tioga-Madison Unit owned the well bore and casing of the K–119 Well; that the K–119 Well had not been plugged or abandoned; and that, unless Furlong was restrained from further entry or interference with the well bore of the K–119 Well, the Tioga-Madison Unit would be deprived of its property rights.[2] Also, on April 6, 1983, Amerada secured a temporary restraining order enjoining Furlong from entering or interfering with the well bore of the K–119 Well. A hearing on the application for a temporary injunction was set for April 19, 1983, but has not been held.

Furlong was served with the restraining order on the afternoon of April 6th. At that time reentry operations were underway and a depth of approximately 5,000 feet had been reached. On the morning of April 7, 1983, Furlong filed an ex parte application to dissolve the temporary restraining order. Furlong alleged that the action by Amerada constituted an impermissible collateral attack on a prior Industrial Commission order,[3] that no irreparable injury had been established, and that the security posted was inadequate. Waiving notice, both parties appeared at 2 p.m. on April 7th for a hearing on the motion to dissolve the restraining order. The court allowed both parties to present oral testimony at the motion hearing. At the close of the hearing, the district court ruled that the temporary restraining order should be dissolved and an order to that effect was entered immediately thereafter.

Following the dissolution of the restraining order, Furlong renewed its reentry operations at the K–119 Well. On April 8, 1983, Amerada appealed the April 7, 1983 order dissolving the temporary restraining order and applied to this Court for an immediate stay of the order. We vacated the April 7, 1983 order that same day and once again Furlong was forced to halt its reentry operations at the K–119 Well. By the time reentry operations were halted on April 8th,

---

1. A shut-in well is a producing well that has been closed down temporarily for repairs, cleaning out, building up pressure, lack of market, etc. The definition includes wells that are not actually producing, but which have not been permanently plugged with cement or abandoned. See Williams and Meyers, *Manual of Oil and Gas Terms,* p. 700 (5th Ed.1981).

2. The Tioga-Madison Pool was voluntarily unitized in 1958; however, the Syversons did not ratify the Tioga-Madison Unit agreement and their interest was not unitized. Although Amerada released the oil and gas lease as to the Syversons' interest in November 1974, various other cotenants whose mineral interests were subject to the same lease had ratified the vol-

untary unit agreement and the lease remained in effect as to these unitized interests by virtue of the unit operations. Claiming an interest in approximately 10% of the minerals in the property in question, Amerada, as the designated operator of the Tioga-Madison Unit, brought this action on its own behalf as a working interest owner in the Tioga-Madison Unit and on behalf of the Tioga-Madison Unit.

3. On November 23, 1982, in Case No. 2641, the North Dakota Industrial Commission issued Order No. 2970 which granted Furlong permission to reenter the well bore of the K–119 Well and recomplete the well. Amerada did not appeal from that order. See § 38–08–14, NDCC.

the total depth of the well bore had been probed and the 8300 feet of pipe used to probe the well bore had been withdrawn and was being stored in 90-foot lengths in a rack on the work-over rig.

On April 12, 1983 Furlong applied to this Court for an order to either reinstate the April 7, 1983 order dissolving the temporary restraining order, or to dissolve our order of April 8 and remand the case for a hearing on whether or not a temporary injunction should issue, or to modify the order to allow Furlong to enter the site for the purpose of laying down the rig and allowing the work-over rig to be released. On April 13, 1983, we amended our order of April 8 to allow Furlong to reenter the well bore for the limited purpose of laying down the pipe and releasing the rig. We further ordered that the appeal be expedited, and oral argument was scheduled for April 22, 1983.

The only issue for us to address is whether or not the district court abused its discretion when it dissolved the temporary restraining order.[4]

■■■ A restraining order, or an order to show cause in the nature of a restraining order, may be issued ex parte without a hearing if the moving papers show "... that there exists such an exigency or occasion as requires the immediate issuance of an order so that the rights of the parties may be preserved." Section 32–06–07, NDCC. A temporary restraining order is, in effect, a species of injunction. The purpose of a temporary restraining order is to maintain the status quo until a determination can be made on the temporary injunction issue. *Gunsch v. Gunsch,* 69 N.W.2d 739 (N.D.1955). See also 42 Am.Jur.2d, Injunctions, § 10.

■■■ The decision to grant, deny, continue, or dissolve a temporary restraining order is equitable in nature and rests within the sound discretion of the trial court. *Allen v. Minot Amusement Corp.,* 312 N.W.2d 698 (N.D.1981). In reviewing an appeal from an order dissolving a temporary restraining order, we are limited to the question of whether or not the trial court abused its discretion. *Edgeley Ed. Ass'n v. Edgeley Pub. Sch., Etc.,* 231 N.W.2d 826 (N.D.1975).

■■■ On the hearing of the motion to dissolve a restraining order, the court will consider the object and nature of the relief sought in the complaint, as well as the property or other rights requiring protection and the interests of the parties in the subject matter. The court must consider the injury to the defendant if the restraining order is continued and the injury to the plaintiff if it is dissolved. See generally 42 Am.Jur.2d, Injunctions, §§ 323–328. Although a temporary restraining order will be dissolved when the reasons for granting it cease to exist and when it will no longer serve a useful purpose, a properly granted restraining order ordinarily will not be dissolved absent a change in the facts or the law after the time of its issuance. *Wahpeton Public Sch. Dist. v. North Dakota Ed. Ass'n,* 166 N.W.2d 389 (N.D.1969); *Brace v. Steele County,* 77 N.D. 276, 42 N.W.2d 672 (1950); 42 Am.Jur.2d, Injunctions, § 326.

■■■ The granting of a temporary restraining order does not create a right, but merely protects the rights of a complainant by maintaining the status quo until such time that a show cause hearing on the temporary injunction can be held. 42 Am. Jur.2d, Injunctions, § 323. The court does not decide the case on the merits at the time of the hearing of the motion to dissolve, but merely determines if a sufficient prima facie showing has been made entitling the complainant to a temporary re-

4. Although the parties have raised issues concerning ownership of the surface and downhole equipment in the K–119 Well, i.e., whether or not Amerada abandoned the well, and concerning the authority of the Industrial Commission to authorize a subsequent lessee to use the well bore and surface and down-hole equipment left by a prior lessee, we cannot decide these issues prior to an evidentiary hearing. In reviewing an appeal from an order dissolving a temporary restraining order, we are limited to the question of whether or not the trial court abused its discretion. *Edgeley Ed. Ass'n v. Edgeley Pub. Sch. Etc.,* 231 N.W.2d 826 (N.D. 1975).

straining order until a hearing on the temporary injunction is held. 42 Am.Jur.2d, Injunctions, § 328. If a prima facie showing of entitlement is made, the temporary restraining order should not be dissolved and a motion which seeks to dissolve the restraining order should ordinarily be denied. Exceptions may be warranted if there was fraud or deception in the original application.

In the instant case, Amerada made a sufficient prima facie showing entitling it to a temporary restraining order and such an order was properly granted on April 6, 1983. Amerada alleged that irreparable harm would result to its property unless a restraining order was immediately issued. This allegation was supported by the affidavit of Don Wilkes, the operations manager for the Williston office of the Amerada Hess Corporation. Upon the posting of a bond determined by the court to be adequate, the temporary restraining order was issued.

The reasons for granting the temporary restraining order had not ceased to exist when the court entered its order dissolving the restraining order on April 7, 1983. A court may not dissolve a properly granted temporary restraining order merely because it has second thoughts about the granting of such an order. Before a restraining order may be dissolved the reasons for granting the order must cease to exist so that the restraining order will no longer serve its purpose of preserving the status quo. Because Amerada made a prima facie showing entitling it to a temporary restraining order, and because no change in the facts or law occurred between the time the restraining order was granted and the time it was dissolved, the temporary restraining order should not have been dissolved and the district court abused its discretion in doing so.

The order dissolving the temporary restraining order is reversed and the case is remanded so that a show cause hearing may be held to determine whether or not a temporary injunction should issue. At this time, prior to an evidentiary hearing, any opinion rendered as to the remaining issues raised by the parties would be advisory in nature and, therefore, we decline to comment on those issues.[5]

Reversed and remanded.

ERICKSTAD, C.J., and SAND and PAULSON, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I reluctantly concur in the majority opinion. Although I agree that because the appeal is from an order dissolving a temporary restraining order the issue before us is whether or not the trial court abused its discretion, I am also aware that once a hearing has been held on a petition for a temporary restraining order, as a practical matter there is little to be added by the parties at subsequent hearings. Here, there was a hearing and although it was on a motion to dissolve the temporary restraining order I doubt many additional facts will be adduced at future hearings. The materi-

---

5. Although we decline to comment on the remaining issues, we note that it is statutorily "... declared to be in the public interest to foster, to encourage, and to promote the development, production, and utilization of natural resources of oil and gas in the state in such a manner as will prevent waste; to authorize and to provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas be had and that the correlative rights of all owners be fully protected; and to encourage and to authorize cycling, recycling, pressure maintenance, and secondary recovery operations in order that the greatest possible economic recovery of oil and gas be obtained within the state to the end that the landowners, the royalty owners, the producers, and the general public realize and enjoy the greatest possible good from these vital natural resources." Section 38–08–01, NDCC.

The Industrial Commission has continuing jurisdiction and authority over all persons and property, public and private, necessary to effectively enforce the provisions of the oil and gas control statutes. Section 38–08–04, NDCC. This includes the authority to regulate the drilling, producing, and plugging of wells, and all other operations for the production of oil or gas. Section 38–08–04(2)(a), NDCC.

al facts are not at issue and it is doubtful the reversal and remand will accomplish anything except delay. Unless the parties agree to resolve their differences the same questions may well be before us again on an appeal from an order denying a permanent injunction. I would prefer that we answer the questions now and avoid further delay to the attempt of the Syversons to develop their minerals. However, I defer to the majority opinion's somewhat technical definition of the issue before the court because I recognize the possibility, as opposed to the probability, that future hearings in the trial court will develop facts or issues not presently before the court.

Nevertheless, I take this opportunity to express my concern about the failure of Amerada to appeal the Industrial Commission's Order No. 2970 referred to in footnote 3 of the majority opinion. Although in that order the Commission affirmatively stated it made no finding as to the ownership of the surface and downhole equipment in the Syverson well, it is clear from other findings in the order that the Commission determined that the well was deserted pursuant to Section 43–02–03–55 of the rules and regulations of the Industrial Commission as set forth in the North Dakota Administrative Code. It is also clear that the Commission found the well was an abandoned well which it could require Amerada to plug in accordance with Section 43–02–03–55, N.D.Admin.Code, but that such requirement would constitute "economic waste" in view of Furlong's intent to develop the well.

It is apparently Amerada's position that the well was not abandoned. Despite the fact the order gave Furlong the authority to enter the well, Amerada took no appeal from the order. If an appeal had been taken from the order the issues now before us could have been resolved in a timely fashion.

The Commission apparently has no authority to determine the ownership of the equipment. But if, as the Commission determined, the well was abandoned, it is questionable that Amerada had any right to

the surface and downhole equipment after 13 years. See Summers Oil and Gas, Sec. 526. Amerada's position is that it may need the well for injection for enhanced recovery purposes. Because of the Commission's order that Amerada had not presented evidence to the Commission's satisfaction that the well has been or will be used for enhanced recovery or salt water disposal pursuant to the requirements of Section 43–02–03–55, Amerada's failure to appeal the order may now foreclose judicial review of that determination.

SAND and PAULSON, JJ., concur.