AMERADA HESS CORPORATION, in its own behalf and as unit operator of the Tioga-Madison Unit, Plaintiff, Appellant and Cross-Appellee,

v.

FURLONG OIL AND MINERALS COMPANY, Defendant, Appellee and Cross-Appellant.

Civ. No. 10530.

Supreme Court of North Dakota.

April 24, 1984.

Fleck, Mather, Strutz & Mayer, Bismarck, for plaintiff, appellant and cross-appellee; argued by John Morrison, Bismarck.

Bjella, Neff, Rathert, Wahl & Eiken, Williston, for defendant, appellee and cross-appellant; argued by Vern C. Neff and Charles L. Neff. Appearance by Fred C. Rathert, Williston.

SAND, Justice.

Amerada Hess Corporation appealed from a judgment denying its requested injunction prohibiting Furlong Oil and Miner-

als Company from using the K–119 well bore and awarding Furlong damages for work stoppages caused by the issuance of a temporary restraining order sought and received by Amerada. Furlong cross-appealed from that portion of the judgment determining that Furlong was not entitled to punitive damages. We affirm in part and remand for further proceedings.

On 26 October 1949, Clifford A. Syverson and Alice O. Syverson leased their oil and gas interest in a parcel of land to A.M. Fruh and Thomas W. Leach, who subsequently assigned the lease to Amerada Petroleum Corporation, the predecessor to Amerada Hess Corporation.

Amerada drilled and completed the well now at issue [hereafter referred to as the K–119 well or as the Syverson # 1 well] as a producer in the Rival Zone of the Madison formation in 1956. Amerada, to the extent that its lessors ratified the unit agreement, committed its interest in the well to the Tioga-Madison Unit, of which Amerada is the operator. The Syversons did not ratify the unit agreement, which right was recognized in *Syverson v. North Dakota State Industrial Commission*, 111 N.W.2d 128 (N.D.1961). The well continued to produce until September 1969, when it was shut in. Amerada relinquished the oil and gas lease as to the Syversons' interest in November 1974.

By instrument dated 17 November 1981, the Syversons leased their oil and gas interest to Furlong. Furlong thus acquired 80% of the working interest in the oil and gas. Furlong subsequently acquired an additional 10% of the working interest. Amerada has the remaining 10% of the working interest.

Furlong applied to the North Dakota Industrial Commission for authority to enter the K–119 well bore. A hearing, at which Amerada was present and participated, was held on the application on 26 October 1982. The Industrial Commission issued its Order No. 2970 on 23 November 1982. The Commission found, among other things:

"(10) That the Syverson # 1 well ... is also potentially productive in the Midal and Ratcliffe Zones of the Madison Pool.

"(11) That it would be more economical to produce the Midal and Ratcliffe through the existing well than to drill a separate well, and therefore drilling a second well would constitute economic waste.

*   *   *   *   *   *

"(14) That the Syverson well has not produced oil for more than 13 years, and failure to produce oil is prima facie evidence of desertion of a well pursuant to North Dakota Administrative Code 43–02–03–55.[1]

"(15) That Amerada Hess has not presented evidence to the Commission's satisfaction that the well has been or will be used for secondary recovery or salt water disposal ....

"(16) That requiring Amerada Hess to plug the Syverson well ... would constitute economic waste in light of Furlong Oil and Minerals Company's request to enter the well.

"(17) That the Commission makes no finding as to the ownership of the surface and downhole equipment in the Syverson well."

The Commission then ordered (1) that Furlong "be allowed to enter the well"; (2) that Amerada be relieved of its plugging and reclamation obligations; (3) that Furlong "is the operator[2] of the well"; and (4) that a certain method be used in allocating production, if any, to the Tioga-Madison Unit and to the individual mineral owners who are not participating in the Tioga-Madison Unit. No appeal was taken from this order.

Furlong thereafter built an access road to the well site, secured a workover rig, and on 6 April 1983 commenced reentry of the well. Amerada brought an action on 6 April 1983 seeking to enjoin Furlong from entering, using, or interfering with the well bore of the K–119 and secured a temporary restraining order. Furlong was served with the restraining order that afternoon. Furlong at this time had reached a depth of approximately 5,000 feet in the reentry operations.

On 7 April 1983, Furlong filed an ex parte application to dissolve the temporary restraining order and both parties appeared at a hearing on the motion that afternoon. Following the hearing, an order dissolving the temporary restraining order was entered and Furlong renewed its reentry operations.

On 8 April 1983, Amerada appealed the 7 April 1983 order dissolving the temporary restraining order to this Court. We vacated the 7 April 1983 order on 8 April 1983 and Furlong again halted its reentry operations, by which time the total depth of the well bore had been probed. On 13 April 1983, we amended our order of 8 April 1983 to allow Furlong to reenter the well bore to lay down the pipe stored on the workover rig and release the rig.

In *Amerada Hess Corp. v. Furlong Oil & Minerals Co.*, 336 N.W.2d 129 (N.D. 1983), decided 24 June 1983, we reversed the trial court's order dissolving the temporary restraining order and remanded the case so that a show cause hearing could be held to determine whether or not a temporary injunction should issue.

Following remand, a hearing was held in the district court on 18 August 1983. After the presentation of evidence through witnesses and exhibits, the parties stipulated that the court could decide the matter

---

1.  *"43–02–03–55. Desertion of wells.* The removal of production equipment or the failure to produce oil or gas (other than a gas well shut in for lack of a market) for a period of one year is prima facie evidence of desertion of a well. Such well shall be plugged in accordance with the rules and regulations of the commission, and the site restored. The enforcement officer may grant exceptions to this section if it can be shown to its satisfaction that the well is to be utilized for saltwater disposal or enhanced recovery operations."

2.  Section 43–02–03–01(38), N.D.Admin.Code, provides that "'Operator' means any person or persons who, duly authorized, is in charge of the development of a lease or the operation of a producing property."

on its merits as no further testimony or evidence would be offered. The court, on 29 August 1983, issued an order finding that Amerada had abandoned the well, denying Amerada's request for a permanent injunction, awarding Furlong $27,781.44 as costs attributable to work stoppage, denying Furlong's request for punitive damages, and denying attorney's fees. Findings of fact, conclusions of law, and order for entry of judgment were issued on 7 September 1983, and judgment was entered thereon on 8 September 1983. ·

Amerada appealed on 13 September 1983. Furlong cross-appealed from the denial of punitive damages on 23 September 1983. On 26 September 1983, the trial court issued a temporary injunction pending appeal enjoining Furlong from entering, interfering with or using the K–119 well bore.

Amerada has raised the following issues in its appeal:

"1. Whether this action constitutes a collateral attack on a previous Industrial Commission order, thereby barring the action by the doctrines of collateral estoppel or res judicata?

"2. Whether the trial court erred in finding that there had been an abandonment by Amerada Hess Corporation or the Tioga Madison Unit of rights in the well bore of the K–119 well?

"3. Whether the trial court erred in refusing to grant plaintiff the injunctive relief requested?

"4. Whether the evidence supports the trial court's award of damages?"

The issue in Furlong's cross-appeal is whether or not the trial court erred in not awarding punitive damages to Furlong.

We are met at the outset with Amerada's assertions that the findings of fact and conclusions of law prepared by counsel for Furlong and signed by the court were submitted without a request from the court; went beyond the court's 29 August 1983 order (which we deem to be a memorandum of decision) by concluding that Amerada's failure to appeal the Industrial Commission's Order No. 2970 made that determination final; and therefore should be disregarded to the extent that they provide an additional basis for the trial court's decision.

■ We have examined and compared the court's memorandum of decision with the findings and conclusions and do not find them to be inconsistent. The findings and conclusions make apparent the bases upon which the court rested its decision and they accurately reflect the rationale contained in the trial court's memorandum of decision. Further consideration of these assertions is not warranted.

Amerada stated in its brief that "[a]lthough the collateral estoppel or collateral attack doctrine was not one of the bases for the trial court's action, it appears to be an issue which permeates this entire action." We agree.

In our opinion, the trial court would have been justified in treating Order No. 2970 as res judicata, and dismissing Amerada's suit for an injunction as an improper collateral attack on the order.

■ The Industrial Commission has very broad, general jurisdiction and authority to regulate the production of oil and gas and the oil and gas industry in this State. *See,* *e.g.,* §§ 38–08–01 and 38–08–04, N.D.C.C.

Section 38–08–13, N.D.C.C., authorizes a person adversely affected by an order of the Industrial Commission issued pursuant to its authority to control gas and oil resources to seek a rehearing; and Section 38–08–14, N.D.C.C., authorizes a person adversely affected by an Industrial Commission order to appeal to the district court.

Amerada participated in the hearing that led to Order No. 2970. The findings made by the Industrial Commission reflect its particular expertise. Amerada had a full and fair opportunity to argue its version of the facts and applicable law. Amerada had the opportunity to seek judicial review by appeal to the district court and from there to this Court if it desired. Amerada chose

not to appeal. No fraud or bad faith were alleged. No jurisdictional defect of the type present in *Minnkota Power Coop. v. Lake Shure Properties*, 289 N.W.2d 230 (N.D.1980), appears on the face of the record.

We held in the Syllabus in *Application of Hvidsten*, 72 N.W.2d 524 (N.D.1955):

"1. An order made by the Public Service Commission of this State, as an administrative body acting within its jurisdiction under authority of law, is not subject to collateral attack, in the absence of fraud or bad faith, the only method of attack available being by appeal as provided by Statute.

"2. Where the Public Service Commission in this State made an order in a proceeding in which it had jurisdiction, and due notice was given to all interested parties and no appeal was taken therefrom, such order was not subject to collateral attack by parties who had due notice of the proceedings and participated therein."

To the same effect is *Chester v. Einarson*, 76 N.D. 205, 34 N.W.2d 418 (1948), where we said in Syllabus 13:

"Where the law provides an appeal from an order or determination of a board whereby the correctness and validity of the order or determination may be reviewed in court the remedy so provided, if adequate, must be pursued and the party having the right of appeal may not disregard such remedy and obtain injunctive relief against the enforcement of the order or decision."

*See also*, 73A C.J.S. *Pub. Admin. Law & Proc.* §§ 153–155 (1983); 2 Am.Jur.2d *Admin. Law* §§ 493, 496 (1962).

■ The situation presented is precisely the type in which the doctrine of res judicata is most necessary to prevent collateral attacks on administrative agency decisions in order to protect successful parties from unnecessary, duplicitous proceedings and to prevent the drain on the resources of the parties and the judiciary which is evident here. The question of whether or not Furlong may use the K–119 well bore has thus

far resulted in a hearing before the Industrial Commission, from the order of which no appeal was taken; a hearing in the district court on Amerada's suit to enjoin Furlong's use of the K–119 well; an appeal to this Court, followed by another hearing in the district court; and the present appeal to this Court.

"We do not favor or encourage, nor can we sustain, bifurcated self-induced or self-initiated procedures, one in the administrative process and one in the judicial process covering the same legal questions.

"If such bifurcated procedures were encouraged or sustained, it would create duplication, and uncertainty, and waste manpower and money, with no appreciable result, and all without improving the administration of justice...." *Shark Brothers, Inc. v. Cass County*, 256 N.W.2d 701, 705 (N.D.1977).

*See also, Aasen v. Forsberg, Inc.*, 346 N.W.2d 294, 295 (N.D.1984), where we said that bifurcated proceedings are improper and a drain on judicial economy. Further, in an appeal from an order of the Industrial Commission, we would have the benefit of the Commission's views on the issues of Amerada's abandonment·vel non of the K–119 well and of Furlong's right to use the K–119 well, which we do not have in this collateral proceeding.

Amerada's assertions that the Industrial Commission did not, and could not, determine Amerada's property rights are unavailing. With respect to Amerada's property rights, the Industrial Commission specifically made no finding as to the ownership of the surface and downhole equipment. As to all the other issues before it, the Industrial Commission had statutory authority. Amerada's remedy was to appeal the Industrial Commission's order.

■ Thus, the district court could have dismissed Amerada's suit because it was an improper collateral attack on an Industrial Commission order that was res judicata. The court, however, relied on this rationale

only as an alternative basis for its decision and decided the matter on the merits.

It is undisputed that Amerada drilled the well in issue to completion as a producer in the Rival Zone of the Madison formation in 1956 and the well produced until 1969, when it was shut in. The well has not produced oil or gas since that time. It is undisputed that Amerada relinquished the Syversons' oil and gas interest from its lease in 1974. In addition, the trial court found, among other things:

"X.

"That water injection in secondary recovery operations in the Tioga Madison Unit commenced February 1, 1959, and continued until July, 1972, when terminated; that secondary recovery operations have not taken place since such date and no evidence presented to indicate a true intention on the part of plaintiff to use the Syverson # 1 well for secondary recovery.[3]

\* \* \* \* \* \*

"XII.

"That since the Syverson # 1 well was shut-in in 1969, plaintiff has made visual surface inspections only and has conducted no down hole operations.

\* \* \* \* \* \*

"XV.

"That the Syverson # 1 well ... is also potentially productive in the Midale and Ratcliffe zones of the Madison Pool.

"XVI.

"That ... the North Dakota Industrial Commission issued a drilling permit to defendant on November 25, 1982, and named defendant the operator of the Syverson # 1 well all as evidenced by Order No. 2970 entered in Case No. 2641. That said order has never been amended and no appeal was taken therefrom by plaintiff.

\* \* \* \* \* \*

"XXVI.

"That it would be more economical to produce the Midale and Ratcliffe zones through the Syverson # 1 well than to drill a second well."[4]

In its conclusions of law the court stated, among other things:

"V.

"... plaintiff's failure to appeal Order No. 2970 ... has the legal affect [*sic*] of making that determination final between the parties to this present action. See *Application of Hvidsten*, 72 N.W.2d 524 (N.D.1955).

\* \* \* \* \* \*

"VIII.

"... this court finds that the plaintiff has abandoned the Syverson # 1 well and therefore the plaintiff no longer has any 'protectable interest' in the Syverson # 1 well, ..."

We have examined the record with regard to the findings of fact and conclusions of law set out above. We do not find that any of the above findings are clearly erroneous, nor do we find that any of the above conclusions of law are not supported by the findings of fact or are contrary to the law.

■■ Amerada contends that neither intent to abandon nor acts of abandonment

---

3. Amerada's regional production manager also testified that Amerada has approximately 200 shut-in wells in the Tioga-Madison Unit.

4. There was testimony that completing a new well would cost $600,000 to $700,000, while completing the K–119 well would cost about $200,000.

There was also testimony by a petroleum engineer that drilling a new well would not be economical. The same witness also testified

that 50,000 barrels of oil might be recovered through reentry of the K–119, but without reentry of the K–119 most of that oil will probably remain in the ground. Such a result, if it occurred, would not be consonant with the policy expressed in § 38–08–01, N.D.C.C., to "... provide for the operation and development of oil and gas properties in such a manner that a greater ultimate recovery of oil and gas be had ...."

were shown. Intent to abandon and overt acts of abandonment or physical relinquishment are necessary to constitute abandonment. *Olson v. Schwartz*, 345 N.W.2d 33 (N.D.1984); *Sorum v. Schwartz*, 344 N.W.2d 73 (N.D.1984); *City of Minot v. Fisher*, 212 N.W.2d 837 (N.D.1973); *Hermon Hanson Oil Syndicate v. Bentz*, 77 N.D. 20, 40 N.W.2d 304 (1949). Intent, of course, may often be shown only by circumstantial evidence. The total overall record, including the findings of the Industrial Commission, particularly number 14 set out above, strongly suggest abandonment and therefore we are unable to say that the trial court erred in making the determination that it did.

■ Because Amerada's suit to enjoin Furlong from using the K–119 well bore was an improper collateral attack on an Industrial Commission order that had become res judicata and because we have determined that the trial court did not err in determining that Amerada had abandoned the K–119 well, it is clear that the trial court did not err in refusing to grant Amerada the injunctive relief it requested.

The final issue raised by Amerada is whether or not the evidence supports the trial court's award of damages. Furlong did not address this issue in its brief. In its conclusions of law, the trial court expressly stated that Furlong was entitled to damages in the amount of $27,781.44 as a result of work stoppages caused by the issuance of the temporary restraining order and also expressly stated that Furlong was not entitled to attorney's fees.

Furlong's Exhibit E at trial showed a total of $27,781.44 as costs attributable to work stoppage. Of that total, $9,931.95 was listed "legal and professional" costs. Furlong testified that those costs were legal fees and fees of a petroleum engineer for testifying at hearings and supplying affidavits. The trial court's conclusions that Furlong was entitled to damages of $27,781.44 (which was equal to the figure provided in Exhibit E, which included attorney's fees) and that Furlong was not entitled to attorney's fees seem to be in conflict. Amerada has also raised other questions about the damages awarded but, because of the disposition we are ordering, we need not resolve them.

■ Arguendo, the trial court may have reasoned that the $9,931.95 listed as "legal and professional" costs were already included in the damages allowed in the amount of $27,781.44 and therefore did not allow separate damages for attorney's fees. This, however, is not apparent from the judgment. We cannot speculate what the court meant but must accept what the court said. We therefore conclude the court decided that attorney's fees were not to be allowed as an item of damages. In addition, the record does not reveal how much of the $9,931.95 was for legal (attorney fees) and how much, if any, was for other professional services such as expert witnesses, etc.

In an attempt to bring finality to this matter, we remand with instructions that, unless Furlong agrees to a reduction of damages by $9,931.95 within ten days after remand, an evidentiary hearing shall be held for the sole purpose of determining what costs and damages, if any, should be awarded.

■ The final issue raised is whether or not the trial court erred in not awarding punitive damages to Furlong. The trial court was aware of all the various proceedings referred to by Furlong in its claim for punitive damages and saw and heard all of the evidence and testimony presented by the witnesses before it and concluded that Furlong was not entitled to recover punitive damages. We must give considerable weight to the trial court's determination. We have not been presented with any persuasive argument that the trial court was mistaken in not awarding punitive damages. We cannot conclude that in denying punitive damages, the trial court "abused its discretion and thereby effected an injustice." *Corwin Chrysler-Plymouth, Inc. v. Westchester Fire Insurance Co.*, 279 N.W.2d 638, 645 (N.D.1979). We affirm the denial of punitive damages.

The judgment is affirmed, except as to the damage award, which we remand with instructions that, unless Furlong agrees to a reduction of damages by $9,931.95 within ten days after the remand, an evidentiary hearing shall be held for the sole purpose of determining what costs and damages, if any, should be awarded.

ERICKSTAD, C.J., and VANDE WALLE, PEDERSON and GIERKE, JJ., concur.