1997 ND 43

**Lee INGALLS, Plaintiff and Appellee,**

v.

**PAUL REVERE LIFE INSURANCE GROUP, Defendant and Appellant.**

**Art Stuhlmiller, National Guardian Insurance Group, and Harley Hoff, Defendants.**

**Civil No. 960145.**

Supreme Court of North Dakota.

March 20, 1997.

Randall J. Bakke (argued), of Smith Bakke Hovland & Oppegard, Bismarck, for plaintiff and appellee. Appearance by Scott K. Porsborg.

Patricia R. Monson (argued), of Dorsey & Whitney, Fargo, for defendant and appellant. Appearance by Todd E. Zimmerman.

Lyle W. Kirmis, of Zuger Kirmis & Smith, Bismarck, for amicus curiae Health Insurance Association of America and American Council of Life Insurance. Submitted on brief.

MESCHKE, Justice.

[¶ 1] Paul Revere Life Insurance Company (Revere) has appealed a judgment against it for breach of a disability insurance policy with its insured, Lee Ingalls, that awarded past and continuing benefits, damages for mental anguish, and exemplary damages. We affirm.

[¶ 2] In August 1990, Ingalls began working as a railroad switchman while also operating his 2,700–acre farm and ranch. On September 14, 1990, and October 15, 1990, Ingalls applied to Revere for disability insurance on forms completed for him by Art Stuhlmiller, an insurance agent. Ingalls listed his occupation as being a farmer, rancher, and railroad switchman. On October 31, 1990, Revere conducted a telephonic Personal History Interview (PHI) with Ingalls. Revere insured Ingalls against a loss of income

due to injury or sickness for up to $1,300 per month.

[¶ 3] On December 22, 1990, Ingalls lost a large part of his right foot in a railroad accident, resulting in four surgical operations within two years. Ingalls submitted a claim to Revere in January 1991. Revere paid benefits through October 2, 1992. Then Revere offered a lump sum settlement of $15,600 that Ingalls declined. At Revere's request, Ingalls furnished copies of his tax returns for 1988, 1989, and 1990. In April 1993, Revere rescinded Ingalls's policy, claiming that Ingalls misrepresented his income in his application.

[¶ 4] Ingalls sued Revere and Stuhlmiller for breach of contract, bad faith, and fraud. Revere answered and counterclaimed, alleging Ingalls fraudulently or negligently misrepresented his income, seeking a declaration it properly rescinded the policy, and seeking restitution of the $18,915 in benefits paid Ingalls before its rescission. After a jury verdict for Ingalls, the trial court entered a judgment awarding Ingalls $62,013.36 for breach of contract, requiring Revere to pay Ingalls disability benefits of $1,300 per month until he reaches age 65, awarding Ingalls $500,000 for mental anguish, awarding him $2,500,000 in exemplary damages, and awarding Ingalls costs and disbursements of $54,060.08. The trial court later revised the judgment to add Ingalls's litigation costs and attorney fees of $242,981.88.

I

[¶ 5] Revere contends the trial court erred in ruling that misrepresentations of Ingalls's income did not increase the insurer's risk of loss as a basis for rescission of the policy.

An oral or written misrepresentation made in the negotiation of an insurance contract or policy by the insured or in the insured's behalf is material or defeats or avoids the policy or prevents its attaching only if the misrepresentation has been made with actual intent to deceive or unless the matter misrepresented increased the risk of loss.

NDCC 26.1–29–25. In applying this law to Ingalls's alleged misrepresentation of income, the trial court instructed the jury:

(3) On [Ingalls's] bad faith claim there are three issues:

A. Has [Revere] proved as a defense that [Ingalls] misrepresented his income in his application for the insurance so as to provide a reasonable basis for rescission of the policy; . . . .

The trial court also instructed the jury:

Defendant Paul Revere rescinded (which means canceled) the disability policy previously issued to [Ingalls] based on its contention that [Ingalls] misrepresented his income on the application. As a defense to the bad faith claim [Revere] claims its rescission was reasonable.

A representation is false when the facts fail to correspond to the assertion or representation. A representation may be altered or withdrawn before the effective date of the insurance but not afterwards. An insurer is entitled to rely on the truthfulness of answers given in an insured's application. This right to rely on the truthfulness of answers given in an insured's application is only waived when the falsity of such answers is distinctly implied or made clear by other facts available to the insurer. The answers in an application for life insurance must be given a reasonable interpretation.

\* \* \* \* \* \*

Paul Revere was entitled to rescind Ingalls' policy if:

(1) [Ingalls] misrepresented facts in the application process for insurance; and

(2) The facts misrepresented increased the risk of loss under the policy.

In proceedings prior to this trial, this court decided as a matter of law that even if [Ingalls] misrepresented his income it did not increase the risk of loss under the policy. Prior to my ruling, the North Dakota courts had not addressed such an issue. However, I did not decide whether [Ingalls] misrepresented his income in the application process as that is a matter for the jury to decide.

Thus, you must decide if [Revere's] action in investigating and then rescinding on the basis of an income misrepresentation was reasonable or whether it was in violation of

the duty of dealing fairly and in good faith with [Ingalls].

You need not concern yourselves whether any alleged misrepresentation increased the risk of loss since that was a question of law which I have already decided. You need only decide whether [Revere's] assertion that [Ingalls] misrepresented his income was reasonable under the duty to deal fairly and in good faith.

[¶ 6] The trial court also instructed the jury about Ingalls's possible fault in the application process contributing to his damages:

Defendant Paul Revere has alleged that [Ingalls] himself committed negligence in the application process thus causing all or part of the damages claimed under the bad faith claim.

Everyone has a duty to exercise ordinary care in conducting his affairs and in doing so, to make reasonable use of his faculties to avoid damage to himself. If he fails to do so, he is guilty of negligence. Accordingly, negligence of an injured claimant is "contributory fault" if it concurs or combines with the fault of a defendant so that the fault of both is a cause of the claimant's injury, although the fault of a defendant may have been different in degree or its effect.

\*　　\*　　\*　　\*　　\*　　\*

The law requires that fault be apportioned among those parties you have found to be at fault in causing [Ingalls's] injuries.

Defendant Paul Revere's fault may consist of breach of the duty to deal fairly and in good faith.

[Ingalls's] fault may consist of contributory negligence.

If, by your answers, you have determined that [Ingalls] and [Revere] are both at fault and that their fault was a cause of [Ingalls's] damages, you must apportion fault among them on the verdict form.

[¶ 7] Revere argued to the jury that Ingalls misrepresented his income:

The first question on your jury verdict form talks about whether or not Paul Revere was reasonable in its decision to rescind in this case. . . .

Now, remember the reason for rescission was misrepresentation of income. And I don't think there is any question but that there was a huge misrepresentation of income on Mr. Ingalls' application for benefits.

\*　　\*　　\*　　\*　　\*　　\*

Mr. Ingalls' conduct must also be considered in this case. You've been given an instruction on contributory negligence. And you are going to be asked to consider what, if anything, Mr. Ingalls did that caused his own damages in this case. And that's every step of the way. . . .

Third, rescission. That is really the most important decision, the most critical for you to make in this case on the issue of rescission and whether or not it was reasonable. What did the company know about Mr. Ingalls' condition, his financial condition at the time that it issued this policy, and what did it learn later on and what did Mr. Ingalls contribute to that misrepresentation? Well, I don't think he not only contributed to it, but he was the sole cause of the misrepresentation. The only cause. The application clearly indicates that he had positive net earnings, the Personal History Interview likewise.

[¶ 8] The special verdict of the jury answered specific bad faith interrogatories:

(1) Do you find that [Revere] has proved that it had a reasonable basis for rescission of the policy by the greater weight of the evidence?

N
_____
(Yes or No)

(2) If you answered (1) above "no," Do you find that plaintiff has proved defendant to have acted in bad faith and to have caused damage to plaintiff by the greater weight of the evidence?

Y
_____
(Yes or No)

(3) If you answered "no" to (1) above and "yes" to (2) above, do you find that [Revere] has proved [Ingalls] to have been contributorily negligent and the cause of

all or part of his claimed damages by the greater weight of the evidence?

_____N_____
(Yes or No)

■ [¶ 9] The special verdict form did not directly ask the jury to determine if Ingalls misrepresented his income. Revere did not ask the trial court to submit that specific question to the jury in the verdict form. Under N.D.R.Civ.P. 49(a), Revere waived jury trial of that issue.[1] In ordering entry of judgment on the jury verdict, the trial court

expressly invoked Rule 49 and found against Revere on all factual issues not submitted to the jury. What is more, in light of the evidence, instructions, and arguments presented to the jury, a fair reading of the special verdict makes it clear that the jury implicitly found Ingalls did not misrepresent his income.

[¶ 10] The evidence supports that implicit finding Ingalls did not misrepresent his income. Ingalls's 1990 application for insurance disclosed the following:

| 11. Fill in amounts as Reportable for Federal Tax purposes | Estimated Current Annual Rate | Actual Last year 1989 | Actual 2 Years Ago 1988 |
|---|---|---|---|
| a. Salary, Fees, Commissions & Bonus | $23,000.00 | $_____ | $_____ |
| b. Pension and Profit Sharing Contributions | | | |
| c. Earnings from other occupations (describe): | | | |
| d. Total Earnings (a + b + c) | 95,000.00 | 93,000.00 | 105,000.00 |
| e. Deductible Business Expenses | 40,000.00 | 45,000,00 | 45,000.00 |
| f. NET EARNED INCOME (d-e) | 50,000.00 [2] | 48,000.00 | 60,000.00 |

[¶ 11] The $23,000 was Ingalls's estimated current rate of pay, including anticipated overtime pay, from his railroad job. To that amount, Ingalls added his farm and ranch income and subtracted farm and ranch expenses. In Revere's telephonic PHI with Ingalls, he estimated a net profit of $25,000 in 1990 and $15,000 in 1989 and 1988. Revere asserts Ingalls's federal tax returns showed that Ingalls's farm losses gave him a negative income, so there was no income to insure, and thus demonstrated that Ingalls misrepresented his income.

[¶ 12] The application did not define "amounts as Reportable for Federal Tax purposes" or "NET EARNED INCOME." An insurer's failure to define what precise income information it sought in an application form has been held to preclude it from later rescinding a disability insurance policy for income misrepresentation. *See, e.g., Gonza-*

*lez–Marin v. Equitable Life Assur. Soc.,* 845 F.2d 1140, 1145 (1st Cir.1988) (that insured's *net* income was less than the policy minimum did not establish insured misrepresented his income, where there was evidence for the trier of fact to conclude that the insured reasonably understood the insurance agent's income question "as a query concerning *gross* income, and that the applicant answered truthfully to the best of his knowledge"); *Nationwide Mut. Ins. Co. v. Clay,* 469 So.2d 533, 542 (Ala.1985) ("Nationwide's failure to tell Clay that 'average earned monthly income' means *net* income prevents it from avoiding coverage on this ground.").

[¶ 13] Gary Ness, a certified public accountant for Revere, opined that Ingalls's 1990 tax return showed he "had a negative net earned income" of $21,128. Ness analyzed the tax return for earned income because "[t]he policy defines earned income very

---

1. Part of N.D.R.Civ.P. 49(a) directs:
   If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives the right to a trial by jury of the issue so omitted unless before the jury retires the party demands its submission to the jury. As to an issue omitted without a demand

the court may make a finding; or, if it fails to do so, it is deemed to have made a finding in accord with the judgment on the special verdict.

2. Agent Stuhlmiller made this computation error.

closely with the Internal Revenue Code's definition of earned income" that includes Schedule F self-employment income and salaries, but does not include income from other schedules, because they "do not depict earned income" but rather "unearned" income. He testified that the sale of "raised livestock" would result in earned income, but not the sale of "breeding stock." Ness acknowledged a farmer or rancher might think all cattle sales would constitute income from the farm or ranch. Ness testified Ingalls reported other types of income on his 1990 tax return that Ness did not include in his calculation of Ingalls's earned income. He agreed "that there can be income that is reported for federal tax purposes that comes from the farm and ranch that is not earned income."

[¶ 14] Ingalls testified he did not know what "amounts as reportable for federal tax purposes" means. He testified he did not prepare his own tax returns because he had "no idea on how to fill them out." Ingalls submitted an exhibit showing he had $24,253 in income reported for federal income taxes that Revere did not consider.

[¶ 15] Robert Murphy, Revere's Director of Field Claims Services, testified, when Revere receives a claim, "it will go to a claim examiner and they'll calculate what they determine the predisability income to be. Typically then it goes to our financial unit and one of the accountants there, they will agree or disagree or perform their own calculations especially with tax returns. They can be pretty confusing and the normal claim examiner may not know how to pull out the income figures."

[¶ 16] Steven Joseph, an employee in Revere's underwriting department, said in a deposition that one is entitled to coverage if he correctly estimates his current year's annual rate of income, even if he inaccurately stated the prior year's income. Joseph testified "reportable for federal tax purposes" means "what an individual would have completed and placed on their tax returns" but Revere does not consider passive income. Joseph testified that Ingalls's estimate of $23,000 in income from the railroad in his application was reasonably accurate. In cal-

culating Ingalls's 1990 income, he counted only $7,461 Ingalls actually made that year, because he had only earned that much before he had his accident. Joseph testified he did not include land-lease income of $23,959, capital gains of $2,266, interest of $116, or a vehicle perk of $6,000. He testified that including those items would result in a positive income of $26,752 in 1990, which is "what happens when we use all the federal tax income, excluding his wife's salary."

[¶ 17] Thus, there was ample evidence for the jury to have reasonably found that Ingalls did not misrepresent his income and that Revere's decision to rescind Ingalls's policy was not reasonable. The jury expressly found Revere did not have a reasonable basis to rescind the policy. Because the jury thus implicitly found that Ingalls did not misrepresent his income, the evidence supports that finding, and the trial court confirmed such a finding against Revere in ordering judgment on the jury verdict, we need not decide whether the trial court erred in ruling that a misrepresentation of Ingalls's income did not increase Revere's risk of loss.

[¶ 18] Revere contends summary judgment should have been entered against Ingalls. There were fact issues about whether Ingalls misrepresented his income, on agent Stuhlmiller's involvement in Ingalls's income representation, and on the weight Revere attached to Ingalls's railroad income. Consequently, the trial court properly denied summary judgment for Revere.

## II

[¶ 19] Revere contends, unless all claims are dismissed, a new trial is required because of evidentiary errors in the jury's finding that Stuhlmiller was an actual or ostensible agent of Revere's. Revere contends the trial court erred in admitting Stuhlmiller's answer to Ingalls's third amended complaint, wherein Stuhlmiller admitted he acted as the agent of Revere. Revere also contends Ingalls did not present clear and convincing evidence of Stuhlmiller's actual or ostensible agency.

[¶ 20] Although Revere contends evidentiary use of Stuhlmiller's answer was not

proper under N.D.R.Ev. 613(b) or N.D.R.Ev. 801(d)(2), Revere did not make those objections at trial. Rather, Revere's only objection was that Stuhlmiller's answer was "already part of the proceedings, the records of the proceedings in this case." We will not overturn a trial court's admission or exclusion of evidence unless the trial court abused its discretion. *State v. Brandner*, 551 N.W.2d 284, 286 (N.D.1996). The trial court did not abuse its discretion here.

[¶ 21] From our review of the record, we conclude there was evidence for the jury to find that Ingalls clearly and convincingly showed that Stuhlmiller was Revere's agent in the sale of the Revere policy to Ingalls. Moreover, under NDCC 26.1–26–06,[3] Stuhlmiller was Revere's agent as a matter of law.

### III

[¶ 22] Revere contends the trial court erred in allowing testimony that Revere's pleadings and legal strategies evidenced bad faith.[4] An insurer's unreasonable defense may evidence bad faith, and whether an insurer has acted in bad faith in refusing to pay a claim is a question for the trier of fact. *Corwin Chrysler–Plymouth, Inc. v. Westchester Fire Ins. Co.*, 279 N.W.2d 638, 644 (N.D.1979). The trial court did not abuse its discretion by allowing evidence about Revere's strategies.

[¶ 23] Revere also contends the trial court erred in excluding evidence about Ingalls's application for disability insurance policies with two other insurers and in excluding evidence of Ingalls's settlement with his railroad employer. The trial court ruled those items irrelevant. Absent an abuse of discretion, a trial court's determination on the relevance of evidence will not be reversed on appeal. *Delzer v. United Bank*, 1997 ND 3, ¶ 20, 559 N.W.2d 531. We conclude that the trial court did not abuse its discretion in excluding this proffered evidence.

### IV

[¶ 24] Revere contends "[t]he jury's finding as to future total disability has no factual support." As we recently explained again in *Schutt v. Schumacher*, 548 N.W.2d 381, 382 (N.D.1996), to review a jury's findings, we view the evidence in the light most favorable to the verdict and determine only if substantial evidence supports it.

[¶ 25] The trial court instructed the jury on total disability:

Total disability is a very relative term which depends largely on the circumstances of the particular case.

Total disability does not mean complete physical or mental incapacity or utter helplessness.

The existence of total disability depends largely on the occupation and employment in which the insured was engaged at the time the policy was issued and when the claim arose. Total disability is an inability on the part of the insured to *do all the substantial and material acts necessary to carry on the insured's business or occupation or any other business or occupation in a customary and usual manner.* Other employment open to the insured must approximate the same livelihood as his former occupation in order for him not to be totally disabled.

---

3. NDCC 26.1–26–06 declares:
   Every insurance agent or limited insurance representative who solicits or negotiates an application for insurance of any kind is, in any controversy between the insured or the insured's beneficiary and the insurer, regarded as representing the insurer and not the insured or the insured's beneficiary. This section does not affect the apparent authority of an agent.
   A similar statute has been part of our law since 1903. *See* S.L.1903, ch. 112, § 1.

4. Revere asserts that "the district court's error forced Paul Revere to take the unusual and prejudicial step of calling its counsel as a witness to defend its pleadings." Counsel's testimony may

well have compounded Revere's litigation problems. He testified that, from his review of the Ingalls file, he concluded "[i]t was pretty clear this guy was not telling the truth" about his income in the application process and "was a liar." He concluded Ingalls had intentionally misled Revere about his income, Revere's rescission was justifiable, and "we should so plead it in drafting the Answer." He testified he did not "talk to an accountant to determine what was meant as income as reportable for federal tax return purposes" because he "[d]idn't need to ... [since he had] taken lots of courses in accounting," and has "a law degree and Masters degree in economics."

Thus, a jury may properly consider the insured's occupation when the disabling event happened, his training in life, his present physical and mental condition, his age, prior work history and educational background, and all other facts presented by the evidence which may have a bearing on what work the insured could fit himself for in a reasonable time. Income which could be derived from another occupation is an important consideration. The occupation must be remunerative in a fair and substantial sense, not merely nominally, and must provide compensation reasonably comparable with that earned in the insured's former occupation. A mere reduction in income will not qualify an insured as totally disabled under the policy.

[¶ 26] Robert Murphy, Revere's Director of Field Claims Services, testified, "Yes, I think [Ingalls] is able to run his farm. I don't believe he is totally disabled." Murphy also testified, "Ingalls is able to do all the substantial and material acts necessary to carry on his occupation of farming and ranching." Michael O'Brien, a Revere field claims representative, testified, "[Ingalls] can't do the physical; but, in my estimation, he was capable of doing the overseeing and the supervising."

[¶ 27] Alan McCurry, a rehabilitation counselor, testified that Ingalls is totally disabled under the definition of disability in the court's instructions. McCurry testified Ingalls "doesn't have transferable skills to sedentary-type, paper-shuffling work."

[¶ 28] Daryl Sandvol, a banker who had helped Ingalls with farm and ranch work, testified that he does not believe Ingalls "is able to operate that farm and ranch successfully in light of his foot injury." Sandvol testified it would be difficult for Ingalls to do any type of work dealing with people outside of the ranch.

[¶ 29] Dr. Dahl, an orthopedic surgeon, who amputated Ingalls's foot and performed two other surgeries on it (Ingalls also had a fourth operation performed in Denver), testified there is a risk of infection and Ingalls could lose the rest of his foot. Dahl testified Ingalls will have problems with swelling, areas with no sensation, skin breakdowns, hy-persensitivity, balance, cold intolerance, and arthritis. Dahl testified Ingalls is unable to perform the material and substantial duties necessary to run his farm and ranch. He testified Ingalls is totally disabled under the trial court's definition of disability. He testified it is more difficult for an amputee to find work, and he does not believe Ingalls has any skills or training other than what he has learned on the farm and ranch.

[¶ 30] Ingalls testified he is 44 years old; he operates a 2,700–acre farm and ranch, where not quite 500 acres is tillable and the rest is pasture, mostly "very rugged;" he "[u]sed to be a pretty good hand, but I am not much anymore;" he has never lived off the farm and ranch; he still gets sores on his stump; he may need to have the rest of his foot amputated in the future; he has no experience other than farming or ranching and has no training in office work of any type. Ingalls submitted an exhibit depicting farm and ranch duties that he was able to do before his injury, but that he can no longer do, he has extreme difficulty performing, or he must hire others to help do. Among those tasks are common things like walking; carrying things; riding a horse; cleaning barns; shoveling; climbing ladders or equipment; machinery repair and maintenance; handling and feeding livestock; walking on snow, ice, mud, loose gravel, grain, or slopes; and like tasks associated with calving, lambing, planting, haying, vaccinating, branding, and moving equipment.

[¶ 31] We conclude substantial evidence supported the jury's disability findings. Indeed, that evidence verifies that Revere's intransigent refusal to recognize the disabling nature of Ingalls's injury was as grievous as the jury believed.

V

[¶ 32] The trial court instructed the jury that violations of this State's Prohibited Practices in Insurance Business Act may be considered as evidence of bad faith. Revere contends the issue should not have been submitted to the jury because there was no evidence that Revere's acts listed in the stat-

ute [5] were performed with a frequency indicating a general business practice.

[¶ 33] Barbara Paull, an independent insurance claims consultant, testified Revere committed a number of acts that violated NDCC 26.1–04–03(9) and that constituted bad faith in claims handling. Paull testified about a 1984 memorandum to Revere field claim representatives from C.D. Smith, a Revere executive:

> The importance of this document is that it is telling the field men they are going to be judged—their performance is going to be judged, they are going to get raises, they are going to keep their jobs if they can close out or finalize 25 percent of the claims that are sent out to them in the field. And then it talks about the particular types of things they can do to get that minimum 25 percent performance.

Paull testified Michael O'Brien, a field claim representative of Revere who attempted to get a "compromise" settlement from Ingalls, used five of the six listed methods to "finalize" Ingalls's claim. Paull testified there is no way an insurance company can know that a certain percentage of their claimants should have their benefits finalized. Paull testified she has seen nothing suggesting Revere no longer attempts to finalize claims through acts described in the memorandum. Paull testified that the Smith memorandum was "evidence of bad faith on a continuing basis by Paul Revere."

[¶ 34] Paull testified about one of O'Brien's acts she thought was particularly improper:

To threaten to sue Mr. Ingalls if he didn't agree with the position of rescission and he sought help from an attorney was certainly improper. And in this case to threaten to do it three times in the memo that we've read was definitely improper.

O'Brien testified about that threat:

Q. Do you extend this type of treatment to all Paul Revere's insureds when you cancel or rescind their policy or benefits?

A. I want to make sure they understand the nature of the rescission and the ramifications thereof.

Q. And so this wouldn't be unusual then for you to tell someone three times you might sue them if they go see a lawyer and try to pursue their rights under the policy?

A. Right.

[¶ 35] We conclude there was evidence for the jury to find the unfair settlement practices prohibited by NDCC 26.1–04–03(9) that Revere used on Ingalls were "performed with a frequency indicating a general business practice," and we conclude the trial court did not err in submitting that issue to the jury.

## VI

[¶ 36] The jury found that Revere acted in bad faith and awarded Ingalls $500,000 in damages for mental anguish on the bad faith claim. Revere contends the award must be reversed or substantially reduced because there is no evidence to support it. We exercise a limited review of jury findings, viewing the evidence in the light most favorable to the verdict, and determining only if

---

5. NDCC 26.1–04–03 declares:

The following are unfair methods of competition and unfair and deceptive acts or practices in the business of insurance:

    \*    \*    \*    \*    \*    \*

9. Unfair claim settlement practices. Committing any of the following acts, if done without just cause and if performed with a frequency indicating a general business practice:

a. Knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages at issue.

    \*    \*    \*    \*    \*    \*

c. Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies.

d. Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims submitted in which liability has become reasonably clear.

e. Compelling insureds to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them when the insureds have made claims for amounts reasonably similar to the amounts ultimately recovered.

    \*    \*    \*    \*    \*    \*

k. Refusing payment of claims solely on the basis of the insured's request to do so without making an independent evaluation of the insured's liability based upon all available information.

there is substantial evidence to support it. *Vanover v. Kansas City Life Ins. Co.,* 553 N.W.2d 192, 197 (N.D.1996). We will set aside a special verdict only if it is perverse and clearly contrary to the evidence. *Id.*

[¶ 37] Because a primary consideration in purchasing insurance is the peace of mind and security it will provide, an insured may recover for any emotional distress resulting from an insurer's bad faith. *Jarchow v. Transamerica Title Ins. Co.,* 48 Cal. App.3d 917, 122 Cal.Rptr. 470, 486 (1975). As we said in *Fetch v. Quam,* 530 N.W.2d 337, 341 (N.D.1995), quoting *State Farm Fire & Cas. Co. v. Sigman,* 508 N.W.2d 323, 326 (N.D.1993), ordinarily "an 'insured pays premiums to receive protection, not a lawsuit from its insurer.' " [6]

[¶ 38] An insurer's bad faith breach of its duties to an insured is likely to cause mental anguish:

> It is inconceivable that a layman, unaccustomed to the courtroom and fearful of the entire judicial process, who is also subjected to financial pressures from a refusal of the insurer to discharge its commitments, will not be subjected to stress the precise effects of which are difficult to measure in exact terms but which, nevertheless, are present.

16A John Alan Appleman and Jean Appleman, *Insurance Law and Practice* § 8878.55 p. 442 (Rev.Vol.1981). Thus, in a case of this kind, damages for mental anguish may be " 'general' damages—'damages for a harm so frequently resulting from the tort that is the basis of the action that the existence of the damages is normally to be anticipated and hence need not be alleged in order to be proved.' " Marilyn Minzer et al., *Damages in Tort Actions* § 1.01[3] (1996) (quoting *Restatement (Second) of Torts* § 904, though miscited as § 940). As the Minzer text also explains at § 3.01[3][b], a claim for mental anguish is a classic example of a noneconomic, intangible loss.

[¶ 39] "Traditionally, the jury had wide discretion in evaluating and awarding these damages." *Id.* The only standard for

evaluation of mental anguish damages "is the amount a reasonable person would estimate to be fair compensation." *Id.,* § 3.01[1]. "The determination of damages for pain, discomfort, and mental anguish largely is dependent upon the jury's common knowledge, good sense, and practical judgment and mainly rests within its sound discretion." *Reisenauer v. Schaefer,* 515 N.W.2d 152, 157 (N.D.1994). The determination of damages for mental anguish "is not susceptible of an arithmetical calculation." *Dahlen v. Landis,* 314 N.W.2d 63, 68 (N.D.1981). "In a case where the amount of damages may be hard to prove, the amount of damages is to be left to the sound discretion of the finder of facts." *B.W.S. Investments v. Mid-Am Restaurants, Inc.,* 459 N.W.2d 759, 764 (N.D.1990). We explained in *Hopkins v. McBane,* 427 N.W.2d 85, 93 (N.D.1988): "Difficulty in measuring damages is a burden that should be borne by tortfeasors rather than their victims."

[¶ 40] After Ingalls suffered his disabling injury and submitted a claim for benefits, Revere began paying him policy benefits. Within two years, Revere began a campaign to reduce or eliminate its liability under the policy. The jury decided Revere engaged in a course of conduct exhibiting bad faith and likely to produce mental anguish. Revere engaged in a process of "postclaim underwriting," according to one testifying expert, when, "instead of looking to pay the claim," it began to "look for all the things in the application that [it] might be able to dig up that would allow [it] to rescind the policy." Revere rescinded the policy for misrepresentation of income without first making a proper investigation. Revere alleged Ingalls had an actual intent to deceive about his income, without a basis for such an allegation. Revere tried to negotiate a compromise settlement with Ingalls while he was in the hospital, was disabled, and had no reason to compromise. Revere gave Ingalls only one day to accept or reject its proposed compromise settlement. In that settlement discussion, Revere threatened three times to sue Ingalls if he sought help from an attorney. Revere relied on a casual statement

---

6. Ingalls testified that when he "bought this Paul Revere policy ... I certainly didn't expect this. I didn't expect this at all. I expected them to pay me."

by Ingalls that he was only partially disabled without making appropriate inquiries to determine his real condition. Revere discontinued paying benefits at a time when Ingalls was entitled to benefits. Revere misrepresented policy provisions to Ingalls. Revere unreasonably compelled Ingalls to sue to recover benefits due under his policy.

[¶ 41] When Ingalls sued Revere, Revere answered and counterclaimed for fraud, alleging, among other things that Ingalls "knowingly, willingly and intentionally deceived Paul Revere regarding his True Income." Even at trial, after Revere had withdrawn the intentional misrepresentation claim, its attorney who drafted its answer and counterclaim testified, among other things: he "looked at the file ... and concluded that this person, Lee Ingalls, had intentionally misled [Revere] about his income;" from looking through the Ingalls file, "[i]t was pretty clear this guy was not telling the truth;" he reviewed the file and "came to the conclusion that Mr. Ingalls was a liar."

[¶ 42] Revere's actions and allegations were likely to cause mental anguish. The jury was well justified in finding that Ingalls suffered mental anguish from Revere's conduct. The appropriate amount of damages to award was, of course, difficult to determine. As we have written in several prior cases, *Vanover v. Kansas City Life Ins. Co.,* 553 N.W.2d 192, 199 (N.D.1996) and *Hopkins v. McBane,* 427 N.W.2d 85, 95 (N.D.1988), each quoting *Schultz v. Winston & Newell Co.,* 68 N.D. 674, 682, 283 N.W. 69, 73–4 (1938), from our review of this record, " 'we are unable to give a safe ground upon which we can say that the verdict is so excessive as to justify our interference therewith.' "

## VII

[¶ 43] The jury found that Ingalls proved by clear and convincing evidence that Revere committed fraud and acted oppressively and maliciously, and the jury awarded Ingalls exemplary damages of $2,500,000. Revere contends the exemplary award must be reversed because it is not supported by evidence of oppression, fraud, or malice and is excessive.

*a. evidence of oppression, fraud or malice*

[¶ 44] At the time of Revere's actions in this case, part of NDCC 32–03.2–11(1) authorized:

In any action for the breach of an obligation not arising from contract, when the defendant has been guilty by clear and convincing evidence of oppression, fraud, or malice, actual or presumed, the court or jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant.

As we explained in *Corwin Chrysler–Plymouth, Inc. v. Westchester Fire Ins. Co.,* 279 N.W.2d 638, 646 (N.D.1979), quoting *Silberg v. California Life Ins. Co.,* 11 Cal.3d 452, 113 Cal.Rptr. 711, 718, 521 P.2d 1103, 1110 (1974), an insurer who violates its duty of good faith and fair dealing with its insured may face exemplary damages if it acted " 'with the intent to vex, injure or annoy, or with a conscious disregard of the plaintiff's rights.' "

[¶ 45] The trial court instructed the jury:

If you find that [Ingalls] is entitled to an award of actual or compensatory damages, and you further find that in doing the act complained of, [Revere] acted fraudulently, maliciously or oppressively, you may in your discretion award [Ingalls] exemplary damages in such a sum as would in your opinion, punish [Revere] for the unlawful act and deter the defendant and others from committing like acts in the future.

However, exemplary damages cannot be allowed against [Revere] unless you find that [Revere] committed fraud, oppression or malice as defined in these instructions by clear and convincing evidence.

The court instructed the jury on fraud and on malice and oppression:

The term *"malice"* and *"maliciously"* import a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law....

For the purposes of exemplary damages, the term *"oppression"* is defined as an act of cruelty, severity, unlawful exaction, or excessive use of authority. It is an act of

subjecting to cruel and unjust hardship, or an act of domination.

[¶ 46] Paull testified about a number of unreasonable and unfair actions in bad faith by Revere for the jury to have inferred fraud, malice or oppression from: Revere did not do a proper investigation before rescinding; Revere improperly sought a compromise settlement when Ingalls was disabled and had no reason to compromise; Revere alleged Ingalls had an actual intent to deceive about his income when there was nothing in their file on Ingalls to suggest he had such an intent; Revere relied on Ingalls's isolated statement he was only partially disabled without properly determining his condition with an independent evaluation; O'Brien talked to Ingalls about a settlement when Ingalls was in the hospital and under medication; O'Brien threatened three times to sue if Ingalls sought help from an attorney; O'Brien gave Ingalls one day to accept their proposed "compromise" settlement; Revere suspended Ingalls's benefits while it investigated whether to rescind for income misrepresentation when it knew he was totally disabled from his railroad job; and Revere engaged in "postclaim underwriting" as Paull, one testifying expert, described it, when "instead of looking to pay the claim and provide a basis for paying the claim, you look for all the things in the application that you might be able to dig up that would allow you to rescind the policy." Paull testified that Revere acted in bad faith. She testified that of the 600–650 previous bad faith claims she has consulted on, "[t]his is definitely in the top ten percent. I would say probably one of the worst cases I have seen of bad faith." Paull testified that Revere's bad faith conduct was intentional and malicious.

[¶ 47] We conclude there was evidence for the jury to find Revere guilty "by clear and convincing evidence of oppression, fraud, or malice," which is what NDCC 32–03.2–11(1) requires for an award of exemplary damages.

*b. amount of exemplary damages*

[¶ 48] Revere contends the amount of exemplary damages awarded is grossly excessive. " 'The reason for awarding punitive damages is to punish the wrongdoer in order to deter him, and others, from repetition of the wrongful conduct.' " *Delzer v. United Bank*, 1997 ND 3, ¶ 22, 559 N.W.2d 531 (quoting *Dahlen v. Landis*, 314 N.W.2d 63, 68 (N.D.1981)). As we also explained in *Delzer*, (quoting *Dewey v. Lutz*, 462 N.W.2d 435, 443 (N.D.1990)): " 'Punitive damages are excessive when the amount of the award is so great that it indicates passion or prejudice on the part of the jury.' "

[¶ 49] In ruling on Revere's post-trial motions, the trial court generally assessed the qualifications of the jurors:

In this case, however, we had an educated and intelligent jury well-qualified to comprehend the issues and the law. For instance, this case involved financial, tax and contract matters. We had two accountants on the jury. The case involved insurance and we had a person experienced in an insurance agency. Others on the jury were qualified to understand the injury and disability issues involved. Finally, most of them had enough farm background to judge the effect of a physical disability on a farmer's ability to do his work. In short, this was a jury not easily misled or one proven to make emotional judgments. They deliberated for a reasonable time without asking any questions. There is no justification for jumping to the conclusion that this admittedly large verdict was somehow the product of emotion or prejudice rather than thoughtful deliberation by nine qualified individuals.

On the amount of punitive damages awarded, the trial court ruled:

This was a good jury which gave thoughtful consideration to the award based on the acts of [Revere] and the factors on which they were instructed. It is a large verdict, but it has adequate support in the evidence. The wealth of [Revere] is a consideration and the verdict is proportional to that wealth and [Revere's] actions regarding its handling on this policy claim.

As we reasoned in *Delzer*, 1997 ND 3, at ¶ 22, 559 N.W.2d 531: "The trial court observed the witnesses and the jury and was in a better position than we are to determine if the jury's punitive damages award resulted from passion or prejudice." We are unable

to conclude that the amount of this punitive damages award is so great that it proves passion or prejudice on the part of the jury. We conclude, therefore, the punitive damages award is not excessive, and it is a reasonable amount in light of its purposes of punishment and deterrence.

[¶ 50] Relying on *BMW of North America, Inc. v. Gore,* —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), Revere contends it "should not be punished, certainly not to the extent of $2.5 million, for rescinding an insurance policy based upon well established legal principles, *i.e.* for conduct lawful in other jurisdictions." The jury did not award exemplary damages to punish Revere for "rescinding an insurance policy based upon well establised legal principles." We are not persuaded that the conduct impelling the jury to award exemplary damages here was lawful conduct anywhere.

 [¶ 51] The statute authorizing exemplary damages, NDCC 32–03.2–11(4), was amended in 1993 to limit them to "two times the amount of compensatory damages or two hundred fifty thousand dollars, whichever is greater." *See* 1993 N.D. Laws Ch. 324, § 3. Relying on *State v. Cummings,* 386 N.W.2d 468 (N.D.1986), Revere contends that this new limitation on exemplary damages applies to this case because it took effect before this lawsuit was commenced. "A statute is employed retroactively when it is applied to a cause of action that arose prior to the effective date of the statute." *Id.* at 471. The statute considered in *Cummings* reduced the mandatory minimum sentence for driving with a suspended license. This court held that, while statutes are not retroactive unless expressly declared so by the Legislature, "an exception should be made to this general rule in the case of ameliorating penal legislation." *Id.* at 472. *Cummings* was "a narrow exception to the general rule" of nonretroactivity. *Midwest Property Recovery, Inc. v. Job Service,* 475 N.W.2d 918, 921 (N.D.1991). "[T]here is a presumption against the retroactive application of a statute unless the legislature has clearly indicated such an intent." *State ex rel. Younger v. Bryant,* 465 N.W.2d 155, 159 (N.D.1991). Revere has not over-come the presumption against retroactivity here.

 [¶ 52] Revere argues "the legislature's passage of the punitive damages cap is persuasive evidence that the award here is excessive." The fact that the Legislature has chosen to reduce the deterrent value of exemplary damages by restricting the extent that wrongdoers may be punished is not persuasive evidence that exemplary damages for conduct occurring before the legislative change are excessive.

[¶ 53] We affirm the judgment in all respects.

[¶ 54] VANDE WALLE, C.J., and MARING, NEWMANN and SANDSTROM, JJ., concur.

