**Warren DOE and Gail Doe d/b/a Doe Dairy Farm, Plaintiffs,**

v.

**SOUTHWEST GRAIN, a division of Cenex Harvest States Corporation, Defendant.**

No. A1–03–04.

United States District Court, D. North Dakota, Southwestern Division.

Feb. 18, 2004.

John Jeremy Mahoney, Mahoney & Mahoney, Center, ND, T.L. Secrest, Secrest Law Firm, Hettinger, ND, for Plaintiff.

David S. Maring, Maring Williams Law Office, PC, Bismarck, ND, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PARTY THE DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

HOVLAND, Chief Judge.

This action arises out of the purchase of dairy feed pellets by the plaintiffs, Warren and Gail Doe, from the defendant, Southwest Grain. On December 29, 2003, Southwest Grain filed a Motion for Partial Summary Judgment wherein it sought the dismissal of the Does' claims for strict responsibility representation, negligent misrepresentation, negligence, fraud, and exemplary damages. For the reasons outlined below, the Defendant's motion is granted in part and denied in part.

## I. BACKGROUND OF THE CASE

The plaintiffs, Warren and Gail Doe, own and operate a dairy farm near Hettinger, North Dakota. It was the Does longstanding practice to feed their dairy herd a home-made mixture consisting of ground corn, ground oats, and a vitamin and mineral supplement that they had purchased from Southwest Grain. However, in 2001, the Does began feeding their herd pellets produced by Southwest Grain with the understanding that the ingredients used in their home-made mixture would be utilized in the pellets. The Does purchased in excess of 750 tons of diary feed pellets over an approximately 13–month period of time. Thereafter, the Does observed a decline in their herd's health and milk production. The Does attributed this decline to what they considered to be Southwest Grain's substandard pellets. According to the Does, the pellets they purchased from Southwest Grain contained, unbeknownst to them, large amounts of wheat middling and urea. The Does contend that these ingredients caused a number of Does' cows to go lame, lose production, and eventually sicken and die. It is alleged that Howard Handcock, Southwest Grain's feed consultant, assured the Does that the urea posed no health risks to the herd and was not the source of the herd's health problems. In addition, Handcock allegedly reaffirmed to the Does that the pellets contained the ingredients originally requested. It is also alleged that Handcock discounted the results of a MUN (urea) test performed on milk obtained from the Does' herd, and, after examining the herd, postulated that wet weather conditions were the cause of the herd's problems.

The Does initiated a lawsuit against Southwest Grain in state court on December 11, 2002, asserting claims of strict responsibility representation, negligent misrepresentation, negligence, and breach of contract. Southwest Grain filed a Notice of Removal on January 7, 2003, citing diversity of citizenship and amount in controversy exceeding $75,000 as a basis for removal. On January 9, 2003, the Does filed notice of their consent to removal. Magistrate Judge Dwight C.H. Kautzmann subsequently directed the parties to prepare a Rule 16(b) Scheduling/Discovery Plan. The parties submitted their joint Scheduling/Discovery Plan to the Court on February 27, 2003. Their plan established a June 1, 2003, deadline for filing motions to amend the pleadings to add claims or defenses.

On June 2, 2003, the Does filed a Motion for Amendment of Complaint wherein they sought to add claims for fraud and exemplary damages. On July 21, 2003, the Court granted the Does leave to filed an amended complaint but refrained from addressing the merits of the Does' claims.

On December 29, 2003, Southwest Grain filed a Motion for Partial Summary Judgment wherein it sought the dismissal of the Does' claims for strict responsibility representation, negligent misrepresentation, negligence, fraud, and exemplary damages. It is Southwest Grain's position that this is essentially a breach of warranty case resolvable by application of the Uniform Commercial Code ("UCC"). Consequently, Southwest Grain asserts that the only relief available to the Does, if any, lies in contract as opposed to tort.

On February 13, 2004, the Does filed a response in opposition to the Southwest Grain's motion. According to the Does, Southwest Grain engaged in tortious conduct independent of the breach of contract claim, i.e., making misrepresentations or false statements regarding the content and nutritional value of the pellets as well as including cheap filler in the dairy feed pellets.

## II. STANDARD OF REVIEW

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Graning v. Sherburne County*, 172 F.3d 611, 614 (8th Cir.1999). A fact is "material" if it might effect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376 (8th Cir.1996). The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed.R.Civ.P. 56(e). A mere trace of evidence supporting the non-movant's position is insufficient. Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## III. LEGAL DISCUSSION

### A. DISTINGUISHING TORT CLAIMS FROM CONTRACT CLAIMS

■ The Does have asserted claims in both contract and tort against Southwest Grain. To sustain their tort claims, the Does must demonstrate that the alleged tortious conduct existed independently of the alleged breach of contract. See *Olander Contracting Co. v. Gail Wachter Investments*, 643 N.W.2d 29, 39 (N.D.2002); *Seifert v. Farmers Union Mutual Insur. Co.*, 497 N.W.2d 694, 696 (N.D.1993); *Pioneer Fuels, Inc. v. Montana–Dakota Utilities Co.*, 474 N.W.2d 706, 709–710 (N.D. 1991). In other words, the Does must present additional, independent facts not connected to the manner of the breach of contract to support the tort claims. See *Delzer v. United Bank of Bismarck*, 527 N.W.2d 650, 654 (N.D.1995). While a tort may occur at the time of and in connection with the breach, or may arise out of the same transaction, it is not committed merely by breaching the contract, even if the breach is intentional. *Pioneer Fuels,*

*Inc. v. Montana–Dakota Utilities Co.,* 474 N.W.2d 706, 710.

In *Pioneer Fuels, Inc. v. Montana–Dakota Utilities Co.,* 474 N.W.2d 706 (N.D. 1991), the North Dakota Supreme Court addressed a tort claim raised in conjunction with a claim for breach of contract. At issue was the defendant's reneging on its oral agreement to purchase oil from the plaintiff. The plaintiff contended that the defendant had engaged in conduct that was willful, deceitful, fraudulent, malicious, oppressive, negligent, and a breach of an implied warranty of good faith and fair dealing. Following a trial where the jury returned a verdict in the plaintiff's favor, the trial court granted the defendant's motion for judgment n.o.v. and set aside the plaintiff's tort claims. On appeal, the North Dakota Supreme Court upheld the trial court's decision on the grounds that the plaintiff had not shown the defendant committed an independent tort that was separate and distinct from the breach of contract claim.

■ The North Dakota Supreme Court again addressed the matter in a case entitled *Dakota Grain Company, Inc. v. Ehrmantrout,* 502 N.W.2d 234 (N.D.1993). In Dakota Grain, the plaintiff purchased what it believed to be Lenn spring wheat from the defendant. The plaintiff later determined that it had actually purchased winter wheat. Thereafter, the plaintiff sought to recoup its losses from the defendant under various theories of recovery, including breach of contract, breach of warranty, negligence, and fraud. The North Dakota Supreme Court held that the claim sounded in contract for breach of an express warranty and that the defendant's alleged negligence was immaterial. Under the Uniform Commercial Code, a bargain that includes a description of the goods to be sold creates an express warranty that the goods will conform to that description. The contract is breached when the delivered goods do not conform to the description, irrespective of whether the seller acted negligently or otherwise. So the seller's negligence, or lack of negligence is not relevant to the question of whether the seller breached his or her warranty to deliver conforming goods.

*Dakota Grain Company, Inc. v. Ehrmantrout,* 502 N.W.2d 234, 236.

## B. NEGLIGENCE AND NEGLIGENT MISREPRESENTATION

■ The present case is distinguishable from Pioneer Fuels and Dakota Grain. The Does' negligence and negligent misrepresentation[1] claims are neither predicated upon nor directly related to the performance of a contract; namely, the manufacture and delivery of dairy feed pellets that conformed to the Does' expectations. Rather, the negligence and negligent misrepresentation claims appear to stem, at least in part, to the statements allegedly made by Southwest Grain's representatives concerning the danger, or lack thereof, posed by the dairy feed pellets urea content as well as the source of the herd's health problems. According to the Does, they expressed concern to Southwest Grain's representatives regarding the inclusion of urea in the feed pellets but were repeatedly assured that it posed no danger to their cattle and was not the cause of the herd's health problems. Whether these statements and reassurances were accurate and based upon sufficient information remains in dispute. However, viewing the evidence in a light most favorable to the party opposing the motion (the Does), and giving them the

---

1. In North Dakota, a claim for relief based on negligent misrepresentation arises under statute, N.D. Cent.Code § 9–03–08(2), as opposed to the general law of negligence. See *Bourgois v. Montana–Dakota Utilities, Co.,* 466 N.W.2d 813, 818 (N.D.1991).

benefit of all favorable inferences to be drawn from the evidence, there are genuine issues of material fact in dispute.

■ The Court finds that the Does' claims of negligence and negligent misrepresentation are independent, separate, and distinct claims from the breach of contract claim. These claims bear little connection to either the performance of the contract or any express warranty arising out of the contract. The receipt of dairy feed pellets that allegedly did not conform to expectations is distinguishable from the assurances that were allegedly made by Southwest Grain's representatives concerning the safety of the non-conforming pellets after the pellets had been delivered and fed to the cattle. See *State Bank of Kenmare v. Lindberg*, 471 N.W.2d 470 (N.D. 1991) (allegations of extra-contractual statements by lender which induced borrowers to alter their position to their detriment sounds in tort). As such, summary judgment is inappropriate. The Court will next address the Does' fraud claim.

## C. FRAUD

Causes of action for fraud and breach of contract are not necessarily inconsistent. See *Delzer v. United Bank*, 559 N.W.2d 531, 534 n. 2 (N.D.1997) (citing *Glendale Fed. S. & L. Ass'n v. Marina View Heights Devel., Inc.*, 66 Cal.App.3d 101, 135 Cal.Rptr. 802, 824 (1977)).

■ Section 9–03–08 of the North Dakota Century Code defines fraud in the context of a contract as follows:

Actual fraud within the meaning of this title consists in any of the following acts committed by a party to the contract, or with his connivance, with intent to deceive another party thereto or to induce him to enter into the contract:

1. The suggestion as a fact of that which is not true by one who does not believe it to be true;

2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true;

3. The suppression of that which is true by one having knowledge or belief of the fact;

4. A promise made without any intention of performing it; or

5. Any other act fitted to deceive.

Under Section 9–03–08, actual fraud requires either an intent to deceive a party to the contract, or an intent to induce that party to contract. *West v. Carlson*, 454 N.W.2d 307, 310 (N.D.1990). "When a party responds to an inquiry about the subject matter of a contract, the response must disclose full, accurate, and truthful information." *Id.* "Although actual fraud may not be presumed, it may be inferred from the facts and attendant circumstances of the transaction." *Id.* "Actual fraud is always a question of fact." N.D. Cent.Code § 9–03–10.

■ The Does contend that their decision to continue purchasing the dairy feed pellets from Southwest Grain stemmed from alleged statements made by Southwest Grain's representatives concerning the content and the quality of the pellets. Thus, they have set forth two separate bases to support their claim of actual fraud.

An examination of the record reveals nothing to indicate any intent on Southwest Grain's part to deceive the Does regarding the quality of the pellets, that is, the health risks associated with the pellets, and by extension the source of the herd's health problems.

Q: Were you damaged in any fashion by the alleged misrepresentation by Howard Hancock (sic) that most cheese [plants] perform M.U.N. tests?

A: No.

Q: And you don't know if Howard Hancock, assuming he made that statement, thought it was a true statement or not when he made it, do you?

A: I assumed it was true.

Q: And you assume that he thought it was true when he made it?

A: Yes.

Q: You didn't think he was lying to you, did you?

A: No.

Q: And basically whenever you talked with Howard Hancock (sic), you thought he was being fair with you and trying to be helpful; correct?

A: Correct.

\*     \*     \*     \*     \*     \*

Q: Now, let's get back to your allegations that Howard Hancock (sic) misrepresented something. Anything else about the conversation concerning the MUN test that you claim was a misrepresentation by Howard Hancock (sic) other than what you've told me already?

A: No.

Q: And you believe that Howard Hancock (sic) was wrong when he said that 18.6 was nothing to worry about?

A: Yes.

Q: But you don't suggest that he was intentionally telling you anything wrong. He just made a mistake; correct?

A: I believe so, yes.

Q: You have no reason to believe he intentionally misled you assuming what he said was wrong; correct?

A: Correct.

\*     \*     \*     \*     \*     \*

Q: With reference to the misrepresentation that you say that Howard Hancock (sic) made when he blamed the weather for open cows, was there anything else other than just that, humidity, heat?

A: He blamed the humidity, yes, hot summer. Said that producers were having a hard time getting cows bred back.

Q: And what information do you have, if any that suggests that humidity and heat is not a factor in whether cows remain open or not?

A: What information do I have?

Q: Yes.

A: I have no information.

Q: So you have no information to suggest that Howard Hancock's (sic) statement was untrue, do you?

A: At that time, no.

Q: Well, at this time you don't have it either. Heat and humidity can be one of the factors in open cows, can't it?

A: Correct.

Q: All you're suggesting is that in your particular instance you now think it was something besides heat and humidity; correct?

A: Correct.

Q: But this doesn't mean that Howard Hancock's (sic) statement was inaccurate or wrong, does it?

A: At that time, no.

Q: Well, even today, if someone said that weather, heat and humidity may be a factor in there being open cows, that could be a true statement today; correct?

A: Correct.

Q: And you have no basis for suggesting that even if Howard Hancock (sic) was wrong about your cows that he was trying to mislead you, do you?

A: Correct.

Q: As far as you know, he was doing his very best to try to help you; correct?

A: I assume so.

Q: And that all you know; correct?

A: Correct.

Q: You have no information to suggest that Howard Hancock or anyone else from Southwest Grain was· trying to harm you, do you?

A: Not that I know of, no.

\* \* \* \* \* \*

Q: So the statement that Howard Hanson made to you about the lameness possibly being caused by wet spring weather conditions is an accurate statement; correct?

A: Correct.

Q: It's just that you don't think that was the explanation for your lame cows; correct?

A: That wasn't the explanation because it continued after the weather dried up.

Q: So what you're saying is that even though Howard Hancock (sic) made what could have been a correct statement, it turns out, at least in your mind, that it wasn't a correct statement?

A: It wasn't a correct statement.

Q: And you have no reason to believe that Howard Hanson was trying to mislead you or deceive you?

A: Howard Hancock (sic)?

Q: Howard Hancock (sic).

A: Correct.

\* \* \* \* \* \*

Q: Do you have any reason to believe that Howard was trying to mislead you in any fashion?

A: At that time, no.

Q: In fact, your thought then and your thought today is that he made a correct statement but it was just an inaccurate statement; correct?

A: Correct.

Q: That he was still trying to do his best to help you; correct?

A: I assumed he was.

See Affidavit of Anthony J. Weiler, Ex. A (Transcript of Deposition of Warren Doe, pp. 202–203, 209–210, 212–214, 215–216, 227–228). It is clear and undisputed from the record that Southwest Grain made no affirmative statement of a fact it knew to be false or suppressed a fact it knew to be true. As such, a claim for actual fraud under Section 9–03–08(1) and (3) fails.

■ However, Section 9–03–08 also includes as actual fraud "[t]he positive assertion, in a manner not warranted by the information of the person making it, of that which is not true though he believes it to be true." N.D. Cent.Code § 9–03–08(2). Unlike Section 9–03–08(1) and (3) of the North Dakota Century Code, Section 9–03–08(2) requires no knowledge or belief in falsity. See *Bourgois v. Montana–Dakota Utilities, Co.*, 466 N.W.2d 813, 816. Instead, it requires only a statement based on insufficient evidence. As noted above, whether Southwest Grain's statements regarding the quality of its pellets and its diagnosis of the herd's ills were based on insufficient evidence remains in dispute and, therefore, would provide the statutory basis for the Does' claims of negligent misrepresentation or statutory fraud as defined under Section 9–03–08(2).

As for statements made by Southwest Grain concerning the content of its pellets, such statements would not provide the Does with a basis for recovery under a fraud theory and such statements would not constitute a breach of a duty which did not arise from the party's contract. According to the Does, they were reassured by Southwest Grain and its representatives on several occasions that the dairy feed pellets consisted of the same ingredients as their home-made mixture and did not contain cheap filler. Such statements would not be considered extra-contractual and would go to the heart of the parties agreement, namely, whether the Does obtained the product bargained for.

In summary, the Does cannot sustain a claim for fraud under Sections 9–08–03(1) and (3) of the North Dakota Century

Code. However, the statutory claim for actual fraud as defined under Section 9–03–08(2) survives summary judgment and is synonymous with the Does claim of negligent misrepresentation. It is well-established that fraud is a statutory claim in North Dakota. The North Dakota Supreme Court has recognized a statutory claim for relief based upon negligent misrepresentation under Section 9–03–08(2). *Bourgois v. Montana–Dakota Utilities Co.*, 466 N.W.2d 813, 818 (N.D.1991). Viewing the evidence in a light most favorable to the Does, it is clear that the facts and attendant circumstances support an inference of negligent misrepresentation or actual fraud.

### D. STRICT RESPONSIBILITY LIABILITY AND EXEMPLARY DAMAGES

■ The Court finds that the Does cannot sustain claims for "strict responsibility liability" or for exemplary damages under North Dakota law. The Does have not established that North Dakota law recognizes a tort claim of "strict responsibility liability" and the Court is unaware of any state that has established such a claim. In addition, the Does have not made the requisite showing of oppression, fraud, or actual malice to warrant a claim for exemplary damages.

■ The statute authorizing exemplary damages is found at Section 32–03.2–11 of the North Dakota Century Code. Section 32–03.2–11 provides in part that [i]n any action for the breach of an obligation not arising from contract, when the defendant has been guilty by clear and convincing evidence of oppression, fraud, or actual malice, the court or jury, in addition to the actual damages, may give damages for the sake of example and by way of punishing the defendant.

N.D. Cent.Code § 32–03.2–11(1). The term "malice" imports a wish to vex, annoy, or injure another person, or an intent to do a wrongful act, established either by proof or presumption of law. See *Ingalls v. Paul Revere Life Ins. Group*, 561 N.W.2d 273, 284–85 (N.D.1997). For purposes of exemplary damages, the term "oppression" is defined as an act of cruelty, severity, unlawful exaction, or excessive use of authority. It is an act of subjecting one to cruel and unjust hardship, or an act of domination. *Id.* Intentional or even willful conduct is not synonymous with oppressive, fraudulent or malicious conduct. See *Bismarck Realty Co. v. Folden*, 354 N.W.2d 636, 643 (N.D.1984).

■ There is a dearth of evidence of oppression or malice on the part of Southwest Grain. Specifically, there is nothing to indicate, and the Does have not even alleged, that Southwest Grain engaged in any act of cruelty, severity, unlawful exaction, or excessive use of authority. In addition, Warren Does' own admissions as set forth above clearly establish that there is nothing in the record to demonstrate that Southwest Grain wished to vex, annoy, or injure the Does, or intended to commit a wrongful act. Rather, the record evinces that the Does believed that Howard Handcock/Southwest Grain's intentions were honorable. Even if the Does were to prevail at trial on their claim of negligent misrepresentation or actual fraud as that term is defined under Section 9–03–08(2) of the North Dakota Century Code, the evidence is insufficient as a matter of law to support a claim for exemplary or punitive damages. The deposition testimony and admissions of Warren Doe clearly demonstrate that there is insufficient evidence of oppression, fraud, or actual malice and that a claim for exemplary damages is unwarranted.

## IV. CONCLUSION

Southwest Grain's Motion for Partial Summary Judgment (Docket No. 33) is GRANTED as it pertains to the Does' claim for strict responsibility misrepresentation a claim for exemplary damages and is DENIED as it pertains to the Does' claims for negligence, negligent misrepresentation and/or actual fraud under Section 9–03–8(2) of the North Dakota Century Code.

IT IS SO ORDERED.